1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
    Case No. 10-cr-00588-JLK
 3
    UNITED STATES OF AMERICA,
 4
    Plaintiff,
 5
    vs.
 6
    MICHAEL HEGARTY,
 7
    Defendant.
 8
    _____
 9
                     REPORTER'S TRANSCRIPT
10                    Detention Hearing

11  _____

12          Proceedings before MAGISTRATE JUDGE CRAIG
    B. SHAFFER, United States Magistrate Judge for the
13  District of Colorado, commencing at 10:23 a.m. on
    November 23, 2010, in Courtroom A402, United States
14  Courthouse, Denver, Colorado.

15                  A P P E A R A N C E S

16  FOR THE PLAINTIFF:
    LINDA A. McMAHAN, AUSA, U.S. Attorney's Office,
17  1225 17th Street, Suite 700, Denver, CO 80202

18  FOR THE DEFENDANT O'BRIEN:
    VIRGINIA L. GRADY, AFPD, Federal Public Defender's
19  Office, 633 17th Street, Suite 1000, Denver, CO
    80202
20
    FOR THE DEFENDANT HEGARTY:
21  RICHARD K. KORNFELD, ESQ., Recht & Kornfeld, P.C.,
    1600 Stout Street, Suite 1000, Denver, CO 80202
22


23


24
        Proceedings Recorded by Electronic Sound Recording;
25          Transcript Produced by Transcription Service
```

1                   P R O C E E D I N G S

2          (In open court at 10:23 a.m.)

3                   THE COURT:  All right.  Let's call

4    10-mj-1186, United States of America v. Michael

5    Hegarty, and United States of America v. Richard

6    O'Brien.  Mr. Hegarty and Mr. O'Brien.  All right.

7    I'll take appearances of counsel.

8                   MS. McMAHAN:  Good morning, your Honor.

9    Linda McMahan on behalf of the United States.

10                   MS. GRADY:  Virginia Grady appearing on

11   behalf of Richard O'Brien.  He appears in custody in

12   one of the yellow outfits.

13                   THE COURT:  Okay.

14                   MR. KORNFELD:  Good morning, your

15   Honor.  Rick Kornfeld on behalf of Mr. Hegarty.  He is

16   the other gentleman in the yellow, second row in the

17   box.

18                   THE COURT:  Okay.  Now, this matter is

19   on my docket sheet solely for a detention hearing.  Is

20   that everybody's understanding?

21                   MS. GRADY:  That's correct, your Honor.

22                   THE COURT:  So there has been a

23   preliminary hearing?

24                   MS. GRADY:  There has not.  When our

25   clients appeared for their initial appearance, at that

1    time the government thought a separate bifurcated

2    proceeding as to the preliminary hearing, which was

3    granted, and that was set for next Monday.

4              THE COURT:  Okay.  So we're proceeding

5    only on the detention question?

6              MS. McMAHAN:  That's correct, your

7    Honor.

8              THE COURT:  That seems somewhat a

9    anomalous, but I suppose --

10             MS. GRADY:  We're certainly ready to go

11   on both --

12             THE COURT:  Yes.  I just --

13             MS. GRADY:  -- if the Court wants to

14   proceed that way.  I think Ms. McMahan intends to put

15   her agent on the stand, anyway.

16             MS. McMAHAN:  I do, your Honor, but

17   there's a specific purpose I requested that date for

18   preliminary hearing, and Judge Boland gave both

19   defense counsel an opportunity to object to that at

20   the last hearing and they decided not to.  So I would

21   request, based on the ability to perhaps save the

22   Court from additional hearing and testimony, that we

23   leave the preliminary hearing for one-thirty on

24   November 29th as it was originally set.

25             THE COURT:  I mean, if it works for you

1    folks, it's fine with me.  It's not necessarily what I

2    would do, but I'm certainly not trying to undo an

3    arrangement that everybody struck, so that's fine.

4              MS. GRADY:  Well, let me just be clear.

5    Neither Mr. Kornfeld or I specifically said yes or no,

6    we're happy with the situation.  The matter at hand

7    last Thursday was that no one could go forward on the

8    detention hearing because our clients had not

9    consented to be interviewed when first approached by

10   Pretrial Services.  So that had to be done.  We all

11   thought we would be able to at least have an

12   expedited --

13             THE COURT:  Right.

14             MS. GRADY:  -- day to the next day for

15   the detention hearing, but that request was summarily

16   denied by the Court, I suspect because there had been

17   a large volume of people in on that court, you know

18   the story --

19             THE COURT:  Right.

20             MS. GRADY:  -- last week.  So this was

21   the first day we had available.

22             THE COURT:  Okay.

23             MS. GRADY:  And we just took it and left

24   it at that.

25             THE COURT:  Okay.  And we'll go forward

1    on that basis.

2              MS. McMAHAN:  We would object.  We would

3    request to only proceed on the detention hearing.

4              THE COURT:  No.  I mean, that's fine.

5    That's what we'll do.

6              MS. McMAHAN:  Okay.  Thank you, your

7    Honor.  We're ready to proceed.

8              MS. GRADY:  May we have our clients sit

9    with us?

10             THE COURT:  Sure, as long as the court

11   security officers are agreeable to that.

12             UNITED STATES MARSHAL:  Your Honor,

13   there's only two of us, and for security purposes we

14   just have them in the jury box.

15             THE COURT:  Well, why don't you stay

16   there.  I mean, I've only got two security officers,

17   unless you want to move all the rest of these people

18   out.  I mean, here's where I'm at.  My preference

19   would be, if it were at all possible, my preference

20   would be to have defense counsel have ready access to

21   their clients so they can ask their clients

22   questions.  Now, I realize that may mean some

23   reshuffling.  If you all think from a security

24   standpoint, since there's only two of you, that that's

25   going to be a security problem, I think the only

1    solution would be we'd have to get everybody else out

2    and bring those two defendants back, which is a bit

3    cumbersome, but at the end of the day, gentlemen, I

4    trust your judgment in terms of court security, and

5    I'm not going to go against you.

6              UNITED STATES MARSHAL:  If we could have

7    a few minutes, we can absolutely do that.

8              THE COURT:  Absolutely, do that.  Then

9    we'll be in recess.

10        (Short recess.)

11             THE COURT:  All right.  We're back on

12    the record in 10-mj-1186.  This matter is on the

13    docket for a detention hearing with respect to

14    defendants O'Brien and Hegarty.  Ms. McMahan, please,

15    go ahead.

16             MS. McMAHAN:  The government would be

17    asking the Court to take judicial notice of the

18    Complaint, Affidavit in this case.  And the Pretrial

19    Services Report.

20             THE COURT:  Absolutely.

21             MS. McMAHAN:  And then we would call

22    Special Agent Curtis Graves to the stand.

23             THE COURT:  Sir, come on up.

24        (CURTIS GRAVES, GOVERNMENT'S WITNESS, SWORN.)

25             THE COURT:  Sir, have a seat, and after

1    you get yourself settled, if you would state your full

2    name and spell your last name.

3                    THE WITNESS:  Curtis Graves.

4    G-r-a-v-e-s.

5                    DIRECT EXAMINATION

6    BY MS. McMAHAN:

7         Q    Your occupation, please.

8         A    Special Agent with the United States

9    Fish and Wildlife Service.

10        Q    And how long have you been a Special

11   Agent with Fish and Wildlife Service?

12        A    Fifteen years.

13        Q    Did you have prior law enforcement

14   experience?

15        A    I was a State Game Warden for five years

16   prior to that in the state of Utah.

17        Q    So a total of 20 years in law

18   enforcement?

19        A    Yes.

20        Q    Were you the undercover officer involved

21   in this investigation involving these two defendants,

22   O'Brien and Hegarty, involving smuggling and

23   purchasing of rhino horns?

24        A    Yes.

25        Q    Do you see them in the courtroom today?

 1          A     Yes.

 2          Q     Would you please identify them by

 3    describing where they're seated.

 4          A     Mr. Hegarty is on my right.  Mr. O'Brien

 5    on the left.

 6          Q     And Mr. O'Brien is seated next to Ms.

 7    Grady; is that correct?

 8          A     Yes.

 9          Q     And Mr. Hegarty next to Mr. Kornfeld?

10          A     Yes.

11                MS. McMAHAN:  May the record reflect

12    identification of the two defendants, your Honor.

13                THE COURT:  It does.

14          Q     (By Ms. McMahan)  Are you the affiant

15    who signed the affidavit attached to the Complaint in

16    this case?

17          A     Yes.

18          Q     And were you involved in the two

19    meetings with these two defendants in an undercover

20    capacity?

21          A     Yes.

22          Q     And what was the purpose of those two

23    meetings?

24          A     To arrange the sale, purchase of

25    rhinoceros horn.

1          Q      And how many meetings did you have with

2    these two defendants in the United States?

3          A      Two.

4          Q      And was one in September?

5          A      Yes.

6          Q      And was that concerning the discussion

7    of the purchase of rhino horns?

8          A      Yes.

9          Q      And when was the second meeting with

10   these defendants?

11         A      November 13th of this year.

12         Q      And was their intent clear from both of

13   those meetings?

14         A      Yes.

15                MR. KORNFELD:   Your Honor, I'm going to

16   object to that question.   It's leading and speculative

17   as to what these gentlemen's intent was.

18                THE COURT:   Yes, I think you have to lay

19   a foundation before you ask that, at a minimum before

20   you ask that question.

21         Q      (By Ms. McMahan)   Could you tell from

22   the two meetings what they planned to do?

23         A      Yes.

24         Q      And what was that?

25         A      They sought to purchase rhinoceros

1    horns.

2             MS. GRADY:  Your Honor, and I'd ask to

3    object and ask him to explain how he could tell.

4             THE COURT:  Yes.  This will take as long

5    as it takes.  Don't worry about rushing us, but I

6    think you've got to walk him through the process.

7             MS. McMAHAN:   Okay.

8         Q     (By Ms. McMahan)  Were there

9    conversations concerning the purchase of rhino horns?

10        A     Yes.

11        Q     And could you tell the Court the content

12   of those conversations beginning in the September

13   meeting.

14        A     In the September meeting, they arrived

15   to the meeting place to discuss the availability of

16   rhinoceros horn, and I expressed to them that I

17   possibly had one available.

18        Q     Did they indicate what they wanted to do

19   with rhinoceros horn?

20        A     The ultimate goal for what they planned

21   on doing with the rhinoceros horn was not known to me,

22   but they did -- all I knew from our meeting was that

23   they were going to take it back to Ireland.

24        Q     Did they express an interest in it being

25   genuine rhinoceros horn?

1      A      Yes.

2      Q      And how did you know that?

3      A      Through emails.

4      Q      And did they also indicate what they

5   were going -- how they were --

6             MS. GRADY:  Excuse me, Ms. McMahan.

7   We're getting, again, quite broad here.  Based upon my

8   reading of the Complaint, the emails involved someone

9   not named Richard O'Brien or Michael Hegarty, and I

10  think we should be specific here.

11            MS. McMAHAN:  Your Honor, it's my goal

12  in this hearing to deal with detention hearings, not

13  with discovery.  The Court has taken judicial notice

14  of the Complaint in this case.  I don't plan to review

15  the entire Complaint.  I was just going to ask some

16  general questions and quickly move on.

17            THE COURT:  I'll overrule the

18  objection.  Go ahead.

19      Q      (By Ms. McMahan)  Did they indicate to

20  you what they planned to do with the rhinoceros horn

21  after they purchased it?

22      A      The only indication they gave me was to

23  take it back and decorate a castle with it.

24      Q      Did they indicate where they were going

25  to transport the rhino horn?

 1          A      Back to Ireland.

 2          Q      And did they indicate they were citizens

 3   of the Republic of Ireland?

 4          A      Yes.

 5          Q      And did they indicate to you what

 6   business they were in?

 7          A      Yes.

 8          Q      And what was that, please.

 9          A      They were in the business of antique

10   furniture dealing.

11          Q      And did they indicate to you that

12   whether or not they knew of the illegality of taking

13   rhino horns from the United States back to Ireland?

14          A      They understood when we told them the

15   illegalities of taking this horn out of the state of

16   Colorado, out of the United States, they understood

17   what we were saying.

18          Q      And how did you know they understood?

19                 MS. GRADY:  I'd ask the Court to

20   disregard the agent's characterization of what our

21   clients understood.

22                 THE COURT:  I think the problem is, Ms.

23   McMahan, yes.

24                 MS. McMAHAN:  I'll take care of it, your

25   Honor.

1                    THE COURT:  Yes.

2          Q     (By Ms. McMahan)  Agent Graves, did they

3    indicate to you how they would transport the rhino

4    horns?

5          A     Yes, they did.

6          Q     And how was that?

7          A     They indicated that they shipped

8    furniture back to Ireland.

9          Q     And what would they do with the rhino

10   horn related to the furniture?

11         A     The information that I was given was

12   that they would take the rhinoceros horn, place it in

13   a chest of drawers, or something, stuff other things

14   around it, place it in the shipping container and that

15   would be that.

16         Q     On November 13th, 2010, did you, in your

17   undercover capacity, sell four rhino horns to these

18   two defendants?

19         A     Yes.

20         Q     And what was the price?

21         A     13,000 euro, which was 17,700, roughly,

22   U.S. dollars.

23         Q     And I want to speak with you for a

24   little bit about the value of rhino horns.

25                    Are you aware of the value of each of

1    those rhino horns at this point in time?

2         A    Rough estimate, yes.

3         Q    Could you explain to the Court what you

4    were doing at this point to determine that.

5         A    Because the investigation was so quickly

6    developed, a definite cost or valuation of the

7    rhinoceros horn is not known.  To me, I'm still

8    investigating the open market value for this

9    commodity.

10        Q    And are you aware of the increasing

11   price of rhino horns?

12        A    Yes.  It is becoming increasingly

13   valuable due to its rarity.

14        Q    And are you familiar from this

15   investigation and others about how the smuggled price

16   compares to often the fair market retail value of the

17   wildlife involved?

18        A    The smuggle price is usually quite a bit

19   lower than the fair market value.

20        Q    And are you aware of a recent sale of a

21   single rhino horn in Argentina and the price that it

22   was sold for?

23        A    Yes, I am.  It sold for $22,000 U.S.

24        Q    And can you explain to the Court the

25   market for rhinoceros horns?

1          A     The market for rhinoceros horns is

2     usually for the traditional Chinese medicines, and

3     it's also being used now for imitation antique

4     libation cups.

5          Q     Now, are you familiar with the

6     endangered nature of the rhinoceros species?

7          A     Yes.

8          Q     Could you tell us a little bit about

9     that and how it relates to CITES protection?

10         A     The rhinoceros has been listed as one of

11     the most endangered species in the world.  The demand

12     for its horn has put significant pressure upon it

13     worldwide, and in its native habitat it's becoming

14     more and more less prominent.

15         Q     And it is on what level of CITES

16     protection?

17         A     It is on an Appendix 1, which is the

18     highest.

19         Q     Is that the highest?

20         A     Yes.

21         Q     After your September meeting with these

22     two defendants, did you have an occasion to try to

23     investigate and find out information concerning these

24     two defendants in Europe?

25         A     Yes.

1        Q      I want to ask you, did you have some

2  contact with law enforcement out of Scotland and

3  Europe?

4        A      Yes.

5        Q      These two defendants you've testified

6  previously are citizens of the Republic of Ireland?

7        A      Yes.

8        Q      Were you able to determine whether or

9  not defendant O'Brien has a prior criminal history in

10  Europe?

11        A      Yes.

12        Q      Could you please tell the Court what you

13  determined.

14        A      In 2004 he was arrested and convicted of

15  conspiracy dealing with the smuggling of cigarettes

16  from Belgium to the United Kingdom.

17        Q      And did you also indicate, see a record

18  that indicated that he had other infractions as well

19  over in Europe?

20        A      Minor traffic offenses.

21        Q      And did you attempt to obtain the same

22  information for defendant Hegarty?

23        A      Yes.

24        Q      And were you able to determine whether

25  or not he has any prior criminal history?

1          A      We determined that he has none.

2          Q      Would you please look at Government's

3    Exhibit 1 and 2, which should be in front of you.  Do

4    you see those?

5          A      Yes.

6          Q      What are they, please?

7          A      Newspaper articles.

8          Q      And is Government's Exhibit 1 a

9    newspaper article dated May 9th, 2004?

10         A      Yes.

11         Q      And do you recognize anyone in the

12   pictures?

13         A      I recognize Richard O'Brien, far right

14   top photograph.

15         Q      And what is the general nature of this

16   article?

17         A      It's an article regarding four

18   individuals that were arrested for cigarette smuggling

19   from Belgium to the UK.

20         Q      And one of them is the defendant

21   Richard, quote, Carey, unquote, O'Brien?

22         A      Yes.

23         Q      And also I want to ask you about

24   Government's Exhibit 2.  Do you see that?

25         A      Yes.

1          Q       And what is that, please.

2          A       It is a news article related to the

3    results of that arrest.

4          Q       And is it dated June 10th, 2004?

5          A       Yes.

6          Q       And does it give information about how

7    many years in prison defendant O'Brien received for

8    the smuggling charge?

9          A       Two years.

10         Q       I want to ask you some questions about

11   whether or not defendant O'Brien's family is involved

12   in this criminal investigation.

13               First of all, is defendant O'Brien

14   related to defendant Hegarty, according to your

15   investigation?

16         A       According to my investigation, Mr.

17   Hegarty is the brother-in-law to Mr. O'Brien.

18         Q       So Mr. Hegarty is married to one of the

19   sisters of Defendant O'Brien; is that correct?

20         A       That's the information I received.

21         Q       And would that be a Kathleen O'Brien or

22   a Kathleen Hegarty?

23         A       Yes.

24         Q       And did you receive other information,

25   or did Kathleen O'Brien have involvement in this case?

```
 1          A      Yes.

 2          Q      Could you tell the Court about that,

 3    please.

 4          A      I received a phone call from Mr. Hegarty

 5    at one time who wanted me to send photographs via

 6    email, and he put his, as he claimed, his wife

 7    Kathleen on the phone to give me that email address.

 8          Q      And did he want pictures of the rhino

 9    horns?

10          A      Yes.

11          Q      And did you also receive some email

12    correspondence from Kathleen O'Brien?

13          A      I sent an email to Kathleen O'Brien of

14    the photographs.

15          Q      And did she also have some involvement

16    in the logistics of the meeting on November 13th,

17    2010?

18          A      Prior to November 13th, I received a

19    phone call from a Kathleen to inform me that Mr.

20    O'Brien was coming to the United States.

21          Q      And was there another person in Ireland

22    who was part of the involvement in the purchase of

23    these rhino horns?

24          A      Yes.

25          Q      And who is that person?
```

1        A      John Sullivan.

2        Q      And did he appear to be involved with

3   both defendants Hegarty and O'Brien?

4        A      Yes.

5        Q      And did they indicate to you during

6   their contacts what his relationship was to the

7   family?

8        A      I was told by Mr. O'Brien that John

9   Sullivan was his cousin.

10       Q      And during your undercover contacts with

11   these defendants, did they tell you what was their --

12   what business they were involved in?

13       A      They were in the business of antique

14   furniture.

15       Q      Did they ever indicate to you that that

16   had to do with their family, the O'Briens?

17       A      No.

18       Q      Did you have an occasion to try to

19   investigate where these two defendants lived in

20   Ireland?

21       A      Yes.

22       Q      Did you receive information from them

23   that it was Rathkeal, Limerick County, Ireland?

24       A      From them?

25       Q      Yes.

1       A       They told me they were from Ireland.

2       Q       When you did further investigation, what

3    did your investigation determine about where they

4    lived?

5       A       It determined that they were from Monks

6    Hill Rathkeal, Limerick County, Ireland.

7       Q       Did you ever receive a specific address

8    during your investigation related to either of these

9    defendants?

10      A       As part of the evidence seized in their

11   personal belongings, we found a document showing a

12   specific address for Mr. Hegarty.

13      Q       And that was like a street address?

14      A       Yes.

15      Q       And during this investigation when they

16   were arrested, did they give you any information about

17   where they actually lived?

18      A       No.

19      Q       Are you familiar with a group of

20   individuals called the Rathkeal Rovers?

21      A       Yes.

22      Q       Could you please tell the Court what

23   your investigation determined about that group.

24      A       Having spoken with a customs

25   investigator out of the Republic of Ireland, he

1    described this group as travelers; it is a law

2    enforcement assigned name to them dealing in fraud,

3    identity, antiquity theft and fraud.

4         Q    And was the description of the business

5    of the defendants, or the business of the Rathkeal

6    Rovers being they dealt with antiques?

7         A    Yes.

8         Q    And that was the same business of the

9    defendants during the undercover contact?

10        A    Yes.

11        Q    And did law enforcement provide you with

12   information that these two defendants may be a part of

13   that particular organization?

14        A    Yes.

15        Q    Did you have a chance to check with ICE

16   on these two defendants concerning their immigration

17   status?

18        A    Yes.

19        Q    And how were they in this country?

20        A    They're under what is called a 90-day

21   Visa Waiver Program.

22        Q    And did you talk to a Special Agent Jeff

23   Lembke?

24        A    Yes.

25        Q    And what did he tell you about that

1   status?

2         A     That status is that they give up rights

3   that a normal visa would allow them to have when it

4   comes to being here in the U.S., they can be here for

5   90 days from entry, upon which time they must leave or

6   be removed.

7         Q     Did you have an occasion to review the

8   passports for both Mr. O'Brien and Mr. Hegarty?

9         A     Yes.

10        Q     And did you look at them and determine

11  whether or not they travel extensively?

12        A     Yes.

13        Q     And could you tell the Court, do they

14  travel extensively?

15        A     According to their passport stamps, they

16  have traveled to China, south -- the Republic of South

17  Africa, Canada and the United States.

18        Q     And that passport, if I remember

19  correctly, was dated 2007.  Or both of their passports

20  were dated 2007; is that correct?

21        A     As issued dates?

22        Q     Yes.

23        A     Yes.

24        Q     Now, during this investigation, did you

25  determine that several times these defendants would

1    give you false or misleading information?

2         A    Yes.

3         Q    I want to ask you about several of those

4    incidences.

5              At some point during your undercover

6    contact in November of 2010, did they indicate to you

7    the location where they were once they arrived in the

8    United States?

9         A    They told me they were in New York.

10        Q    Did you have an occasion to investigate

11   that by obtaining plane tickets?

12        A    Yes.

13        Q    Were they, in fact, in New York?

14        A    According to their plane tickets, they

15   were in Milwaukee, Wisconsin.

16        Q    Did they give you false information

17   about how they were going to arrive to Denver?

18        A    Yes.

19        Q    What did they tell you?

20        A    I was told they would fly into Colorado

21   Springs Airport.

22        Q    And did they say they would then rent a

23   car and drive to Denver?

24        A    Yes.

25        Q    Did your investigation determine that

1    that was true?

2          A      My investigation show they flew into

3    Denver International Airport.

4          Q      And where did they rent the car?

5          A      From Denver International Airport.

6          Q      And then again during your

7    investigation, the addresses that you received for

8    them were the general "I'm from Monks Hill, Rathkeal

9    Limerick, Ireland"?

10         A      Yes.

11         Q      Now, was defendant O'Brien interviewed

12   following his arrest on November 13th, 2010?

13         A      Yes.

14         Q      Was he confronted with the fact that law

15   enforcement was aware of his prior smuggling charge?

16         A      Yes.

17         Q      Did he admit that at first?

18         A      No.

19         Q      After talking to him further, what did

20   he say about that charge?

21         A      He finally admitted that he had been

22   arrested for something having to do with intimidating

23   truckers in Belgium.

24         Q      And again, your investigation is that he

25   was actually convicted of that and sentenced to two

1    years?

2         A    Yes.

3         Q    Are you aware of any ties either of

4    these defendants have to Colorado?

5         A    No.

6         Q    Based on your experience in wildlife

7    cases and with this particular case, are these two

8    defendants facing imprisonment?

9         A    Yes.

10        Q    And are you aware of the statutory

11   penalty for smuggling?

12        A    Yes.

13        Q    And what is it?

14        A    They face up to 10 years in prison.

15             MS. McMAHAN:  May I have just a moment,

16   your Honor.

17             THE COURT:  Sure.

18             MS. McMAHAN:  Your Honor, at this time

19   I'd move for admission of Government's Exhibits 1 and

20   2.

21             THE COURT:  Any objection?  I mean,

22   first of all, the Rules of Evidence don't apply, but

23   go ahead.  Any objection?

24             MS. GRADY:  Let me just tell you a basis

25   I have --

1               THE COURT:  Sure.  Go ahead.

2               MS. GRADY:  -- absent some legal

3     (unclear) why possible consideration should be given

4     here.

5               A foreign conviction has no relevance in

6     sentencing in our system.  So I don't think that the

7     Court can do much with the nature or the fact of this

8     foreign conviction.  I don't know, and I don't believe

9     that this agent can tell us anything about what kind

10    of rules are in place to protect the defendants who

11    are charged in the country of Belgium such as due

12    process or presumption of innocence or any of those

13    things.  But regardless of whether they are, I am

14    certain that it is not at the same high standard that

15    our courts employ, at least that's what all of our

16    judges tell our jurors, and I would think that's

17    probably true, so I'd ask the Court not to consider

18    it.

19              My other concern here is that the first

20    Government's Exhibit 1 is a copy of a newspaper

21    article that comes out of what I believe is the

22    equivalent of the National Inquirer or perhaps the

23    Globe.  So something that you would purchase while

24    you're waiting to pay for your groceries.  And I know

25    that from personal experience, so I think it's a

1    little bit -- the information that is contained in

2    this article is by reputation subject to credibility

3    issues.

4              The RTE News, I think, is something more

5    akin to a traditional news source, but again I don't

6    know anything about RTE, that's Government's Exhibit

7    2, or the reliability of that particular news source.

8    All I can tell you, your Honor, is I certainly don't

9    dispute that a conviction or something that we would

10   consider a conviction occurred in Belgium.  Beyond

11   that, at least for purposes of the sentencing

12   guidelines and I think statutory purposes the Court

13   can consider, that is, in terms of what the possible

14   penalty would be in this case.

15             THE COURT:  I'm not imposing any

16   penalties.

17             MS. GRADY:  Right.

18             THE COURT:  I mean, I appreciate your

19   objection, but I think we're getting ahead of

20   ourselves.

21             MS. GRADY:  Right.

22             THE COURT:  What weight to give to a

23   Belgium conviction is really better left with some

24   ultimate disposition in this case.  I'll give it

25   whatever weight it's worth; but to the extent that

1    you're objecting that I shouldn't consider it at all,

2    I'm going to overrule that objection.  And I will

3    accept Government Exhibits 1 and 2 for whatever worth

4    I give them.  Any cross-examination?

5                MS. GRADY:  Please.  Your Honor, for

6    purposes of the Court's consideration, Mr. Kornfeld

7    and I have obtained and supplied to the Court a letter

8    from Jerry Staunton, S-t-a-u-n-t-o-n, who's the consul

9    general of Ireland in San Francisco.  We spoke with

10   Mr. Staunton by phone.  I can tell you as an officer

11   of the court that it was the first time that Mr.

12   Staunton had heard of the arrests of these two

13   individuals.  He was not notified by anyone in the

14   government.  And he wrote this letter.  I suspect the

15   Court can probably take judicial notice of it, given

16   his position.

17                I also confirmed Mr. Staunton's role

18   with our own honorary counselor for Ireland here for

19   Denver, which is Mr. James Lyons, and he, too, spoke

20   with Mr. Staunton, and this was the letter which Mr.

21   Staunton's office produced.

22                THE COURT:  So you'd like to admit

23   these?

24                MS. GRADY:  Please.

25                THE COURT:  Ms. McMahan.

1          MS. McMAHAN:  Your Honor, I have no

2     objection, but for the record I'd like to approach

3     with the November 15th, 2010 letter that was sent to

4     the consulate of the Republic of Ireland notifying

5     them of the arrest of these two Irish citizens.  If I

6     may approach.

7          THE COURT:  Sure.

8          MS. McMAHAN:  So that information is not

9     correct that they were not (unclear) Maybe, I don't

10    know, the two individuals.

11         THE COURT:  Well, do you want to admit

12    these as defense exhibits, or do you want me to just

13    take notice of them or --

14         MS. GRADY:  I'd like to admit them.

15         THE COURT:  All right.

16         MS. GRADY:  It's the same letter.  You

17    might have two copies.  I don't know.

18         THE COURT:  I think I do have two

19    copies.  So we'll go ahead and mark this as Defense

20    Exhibit A, and Ms. McMahan, do you want to mark your

21    letter as Government's Exhibit 3?

22         MS. McMAHAN:  Sure.

23         MS. GRADY:  May I see Government's

24    Exhibit 3 --

25         THE COURT:  Sure.

1          MS. GRADY:  -- because we don't have

2     copies at the moment.

3          MS. McMAHAN:  Just for the record, your

4     Honor, I had also told Judge Boland at their first

5     appearance that the consulate had already been

6     notified.

7          THE COURT:  Okay.  All right.  Please,

8     Ms. Grady.

9                    CROSS-EXAMINATION

10    BY MS. GRADY:

11         Q    Agent Graves, you told us that you had

12    not quite figured out what the value was of these

13    rhinoceros horns that ultimately were tendered by you

14    acting in an undercover capacity.

15         A    Correct.

16         Q    Where did those horns come from?

17         A    They came from our repository.

18         Q    And before they were in your repository,

19    where did they come from?

20         MS. McMAHAN:  Objection, your Honor.

21    This goes to discovery, and that's not the purpose of

22    this hearing.  The purpose of this hearing is

23    detention.

24         THE COURT:  Ms. Grady, it does seem a

25    bit far afield from the question of detention where

1      the horns came from.

2                  MS. GRADY:  Well, I'm asking how long

3      they had been in the repository and where they came

4      from there on the question of whether or not the horns

5      are, in fact, subject to the CITES Treaty.

6                  MS. McMAHAN:  Objection, your Honor.

7                  THE COURT:  I mean, you can ask him that

8      specific question, but how long they've been in the

9      repository, it seems a bit far afield.

10            Q     (By Ms. Grady)  Agent Graves, under what

11     theory of yours are the horns that are tendered as

12     part of this, I'll call it a reverse sting operation,

13     under your theory, how are they subject to the CITES

14     Treaty?

15            A     Under my theory or the law?

16            Q     Right.  Your experience.  What is your

17     belief?

18            A     My experience is that the rhinoceros and

19     all parts of the rhinoceros are listed as Appendix 1

20     under CITES, giving them the greatest protection in

21     the United States.

22            Q     Were you acting as somebody of another

23     name when you were talking and working on this

24     investigation?

25            A     Yes.

1          Q      What name did you represent yourself as

2    having?

3          A      Curtis Phillips.

4          Q      Curtis Phillips.  Okay.  Was anybody

5    else working with you?

6               MS. McMAHAN:  Objection, again, your

7    Honor.  This goes into discovery.

8          Q      (By Ms. Grady)  Did you tell either Mr.

9    Sullivan -- do you know who Mr. Sullivan is?

10               MS. McMAHAN:  Objection.  Discovery,

11    your Honor.

12               MS. GRADY:  It came up.  She brought it

13    up.

14               THE COURT:  Ms. McMahan, you brought Mr.

15    Sullivan's name into this.  I'll allow her to explore

16    it.  I mean, unfortunately, this is one of the

17    consequences of bifurcating this process.  We're sort

18    of doing it backwards, but we are where we are.  I'll

19    allow some limited questions about Mr. Sullivan.  But,

20    again, let me emphasize, we are here to take the

21    question of detention.  Please, go ahead.

22          Q      (By Ms. Grady)  Who is John Sullivan?

23          A      John Sullivan is an individual I

24    communicated with via email.

25          Q      John Sullivan did not -- represented

1   himself to you as being John Sullivan, but beyond

2   that, do you have any idea who he is?

3        A    No.

4        Q    Okay.  Did you or any of your agents

5   working on this case tell either Mr. Hegarty or Mr.

6   O'Brien that the horns that you were about to supply

7   them could not be traded without violating the CITES

8   International Treaty?

9        A    Not in those exact words, no.

10        Q    Other than did you tell them that it

11   would be illegal for either Mr. Hegarty or Mr. O'Brien

12   to purchase the horns?

13        A    We did not tell them it was illegal to

14   purchase the horns.

15        Q    Did you tell them, in fact, that it was

16   legal for them to purchase the horns?

17        A    We explained to them that it was illegal

18   to purchase the horns and take them out of the state.

19        Q    All right.

20        A    Or out of the country.

21        Q    Okay.  So your words were, It's illegal

22   for you to do, one, purchase them, and in conjunction

23   with take the horns out of the country, correct?

24        A    I don't remember the exact -- we did not

25   explain the law in detail to them in a covert

1    capacity.

2         Q     Okay.  But in a covert capacity, what

3    you did do was attempt to induce them to at least take

4    possession of the horns.

5              MS. McMAHAN:  Objection.  Discovery,

6    your Honor, and then an attempt to mischaracterize or

7    misphrase the evidence.

8              THE COURT:  Mr. Graves can answer the

9    question.  To the extent that he disagrees with the

10   premises, he's certainly free to make his disagreement

11   known.  I'll allow the question.  Go ahead.

12        Q     (By Ms. Grady)  What you did do was you

13   and the other agents working on this case attempted to

14   induce Mr. Hegarty and Mr. O'Brien to take possession

15   of the horns within the District of Colorado.

16        A     I did not try to induce anything.  I

17   provided something that they desired to purchase.

18        Q     All right.  And in fact, what you're

19   alleging in this Complaint, for purposes of this state

20   of the case, was that Messieurs Hegarty and Mr.

21   O'Brien attempted to export these horns.

22              MS. McMAHAN:  Objection, your Honor.

23   The Complaint speaks for itself, and the Court has

24   taken judicial notice about, so I think this is an

25   improper inquiry.

1           THE COURT:  Objection overruled.  Go

2    ahead.

3           Q     (By Ms. Grady)  What you're alleging in

4    the Complaint is that Mr. O'Brien and Mr. Hegarty

5    attempted to export the horns that your agents

6    provided them, correct?

7           A     Yes.

8           Q     In this case, and in the course of your

9    investigation, did you come across any documents on

10   either Mr. Hegarty or Mr. O'Brien which indicated that

11   they had made contact with a shipping agency to export

12   these horns?

13          A     No.

14          Q     When you arrested -- well, let me back

15   up.  Just at the time that you were tendering the

16   horns to Mr. O'Brien and Mr. Hegarty, one of them told

17   you, in fact, that it was not their intent to export

18   the horns, correct?

19          A     I asked Mr. O'Brien if they were taking

20   these horns to Ireland.  He said no.

21          Q     What he told you was that what their

22   intent was was that the horns would be left in

23   Colorado in some sort of -- with some sort of antique

24   dealer at a warehouse, right?

25          A     That's what he told one of the

1    investigators.

2            Q       And that's all the evidence you had

3    about what Mr. O'Brien or Hegarty's intent was to do

4    with the horns that became the subject of this

5    prosecution, correct?

6            A       No.

7            Q       Well, neither one of them produced any

8    kind of documentation that they were going to be the

9    people who were going to export the horns, did they?

10           A       They explained in detail how they were

11   going to take the horns back to Ireland.

12           Q       What they told you was that this was a

13   means with which the horns could be exported to

14   Ireland, correct?

15           A       They told me that's how they were going

16   to do it in our first meeting.

17           Q       When they told you about the horns, that

18   was in September?

19           A       Yes.

20           Q       And when the horns were provided to them

21   in November, what they told you was, it's in the

22   Complaint, right? was that they were going to leave

23   the horns at a warehouse for somebody else to come

24   along and decide what to do with them.

25           A       That is not in the Complaint.

1        Q     Okay.

2        A     That was a follow-up investigation --

3    interview after the arrest.

4        Q     What they told you after the arrest?

5        A     That's what they told one of the

6    investigators after the arrest.

7        Q     And you included that information in the

8    Complaint as the basis for your reason for prosecuting

9    them, correct?

10             MS. McMAHAN:  Your Honor, I object.

11   Whatever's in the Complaint is in the Complaint.

12             THE COURT:  I understand, but the

13   problem is, Ms. McMahan, one of the factors that I

14   need to consider for purposes of detention is the

15   weight of the government's evidence and the

16   seriousness of the offense.  And I think to some

17   extent this line of inquiry goes to both of those

18   questions.

19        Q     (By Ms. Grady)  So going back to the

20   Complaint, you're the author of the Complaint, are you

21   not?

22        A     Yes.

23        Q     And in the Complaint, you state that --

24   and let's just go through this -- that Mr. Hegarty and

25   Mr. O'Brien told you that they were antique dealers,

```
 1   correct?

 2         A     Yes.

 3         Q     And as a matter of fact, following their

 4   arrest you found antique items which they had purchased

 5   in the car that they had rented.

 6         A     I can't tell you if they're antique.

 7   I'm not an expert in antiques.

 8         Q     Well, again, just referring to your

 9   words in the Complaint, you state, quote, on page 11,

10   paragraph W, "Also found in the vehicle were several

11   antique furniture items, including a large chest of

12   drawers."

13         A     Yes.

14         Q     And just in case you were, in fact,

15   uncertain about the truthfulness of this statement, as

16   a follow-up to your investigation you also went to an

17   antique dealer on South Broadway to determine whether,

18   in fact, these two gentlemen had purchased another

19   antique item, did you not?

20         A     Yes.

21         Q     And in fact, they had, during this

22   November -- or during the September trip to Colorado,

23   purchased a large round table from an antique dealer

24   on South Broadway.

25               MS. McMAHAN:  Your Honor, I'm going to
```

1    object to this line of questioning.  Obviously, this

2    goes beyond the Complaint and into further

3    investigation.  It's an attempt to do discovery at

4    this point and does not have any relevance to the

5    detention hearing.

6                    THE COURT:  I think, Ms. Grady, I

7    appreciate your zealous advocacy, but I think we need

8    to stay focused on about what we are about today.

9                    MS. GRADY:  Well, the suggestion has

10   been that these individuals provided false information

11   to the officers, or that their purpose here was not

12   legitimate.  And frankly, this --

13                   THE COURT:  No, no, no, there's been no

14   suggestion.  The specific testimony was brought out

15   about their false statements have nothing to do with

16   whether or not they lied about buying a round table.

17                   MS. GRADY:  Okay.

18                   THE COURT:  And I will accept your

19   representation that they purposely and properly bought

20   the round table, and that will not enter in my

21   detention decision at all.

22                   MS. GRADY:  Okay.

23        Q    (By Ms. Grady)  Let me go back to your

24   testimony, your answers to your questions with Ms.

25   McMahan.

1         You told Ms. McMahan that during the

2 course of your undercover work, some information which

3 was provided to you by Mr. Hegarty or Mr. O'Brien

4 turned out to not be completely accurate.

5         A     Yes.

6         Q     All right.  Such as we're flying out of

7 New York, or we're flying into Colorado Springs,

8 correct?

9         A     Yes.

10         Q     But, in fact, that did not ultimately

11 impair your ability to meet with these individuals and

12 conduct your investigation, did it?

13         A     I don't understand your question.

14         Q     They came to you, right?  Or did you

15 meet them, go to them?

16         A     They came to me.

17         Q     Okay.  And in the course of your

18 investigating them, you did not find any indication

19 that either one of them had committed identity theft.

20         A     No.

21         Q     They told you their names.

22         A     They gave me names.

23         Q     And the names that they're charged under

24 today.

25         A     Yes.

1          Q      Okay.  And this information about

2    Rathkeal Rovers, that's a name that is tagged to a

3    group of people from Ireland by law enforcement in

4    Ireland.

5          A      Yes.

6          Q      Not by Mr. Hegarty or Mr. O'Brien.

7          A      Not as far as I'm aware of.

8          Q      Okay.  You have no information that in

9    the course of this case, either Mr. Hegarty or Mr.

10   O'Brien committed fraud or identity theft.

11         A      No.

12         Q      To the extent that they told you that

13   they live -- or Mr. O'Brien told you that he lives in

14   an area of Rathkeal called Monks Hill.

15         A      That's the address on his passport.

16         Q      And in fact, that's the address which

17   was provided by Mr. O'Brien to Pretrial Services

18   Office in this case.

19         A      Okay.

20         Q      Did you know that?

21         A      Yes.

22         Q      Okay.  And so you're not suggesting that

23   that information is not true, are you?

24         A      No.

25         Q      Okay.  You believe it is true?

1          A      I believe it's an address that they

2    gave.  And, yes.

3          Q      You don't have any reason to believe

4    that it's not true?  Do you have any information to

5    suggest that that address doesn't exist?

6          A      No.

7          Q      Okay.  Regarding Kathleen O'Brien, you

8    sent an email to her, an email address that identified

9    Kathleen O'Brien?

10          A      Kobrien2276@yahoo.com.

11          Q      Did she respond to that email?

12          A      No.

13          Q      In your testimony with Ms. McMahan, you

14    were talking about what kinds of things can be done

15    with rhinoceros horns, right?

16          A      You mean what are there uses?

17          Q      Yes.  And you talked about the Chinese

18    antique -- the Chinese use it for antique medicine.

19          A      Chinese traditional medicines.

20          Q      Okay.  Or perhaps that it could be used

21    for antique cups, some kind of cups?

22          A      It's a new developing use for rhinoceros

23    horn in the role of antiques, and that is libation

24    cups.

25          Q      Okay.  In any of your conversations with

1    Mr. Hegarty or Mr. O'Brien, did either one of them

2    indicate to you an intent to resell the horns that

3    were provided to them?

4            A    No.

5            Q    Regarding the September meeting that you

6    had with Mr. Hegarty and Mr. O'Brien, where did that

7    take place?

8                 MS. McMAHAN:  Objection.  Discovery,

9    your Honor.

10           Q    (By Ms. Grady)  Did it take place in the

11   District of Colorado?

12           A    Yes.

13                THE COURT:  Objection overruled.

14           Q    (By Ms. Grady)  Who invited them to

15   come?

16                MS. McMAHAN:  Objection, your Honor.

17   Again, this is going into discovery.

18                THE COURT:  Come to the meeting or come

19   to Colorado?

20                MS. GRADY:  A meeting.

21                MS. McMAHAN:  Your Honor, I just object

22   to this line of questioning.

23                THE COURT:  I'll allow this question.

24   And Ms. Grady, again, I mean, it's just trying to

25   sound more like fishing than anything else, and I'm

1    really not inclined to entertain much more of this.

2              MS. GRADY:  I'm just trying to clarify

3    that point, your Honor.

4              THE COURT:  I don't think it required

5    clarification, frankly.

6              MS. GRADY:  All right.

7         Q    (By Ms. Grady)  And again, going back to

8    the Complaint and the language of the Complaint, did

9    you uncover any evidence of any kind that Mr. Hegarty

10   or Mr. O'Brien had, in fact, arranged for shipment out

11   of the U.S. of the horns that you provided to them?

12             MS. McMAHAN:  Objection.  Asked and

13   answered.

14             THE COURT:  I understand it, but it will

15   be faster if you just get through it rather than

16   objecting.  Go ahead.

17        A    Restate that, please.

18             THE COURT:  Oh, please.  Why did you do

19   that?

20             THE WITNESS:  I'm sorry.

21        Q    (By Ms. Grady)  Did you uncover any

22   evidence of any kind, and I'm just tracking the

23   language of the Complaint, your Honor, that either Mr.

24   Hegarty or Mr. O'Brien had, in fact, arranged for

25   shipment out of the U.S. of the items which you sold

1    to them?

2             A      No.

3             Q      In the course of investigating Mr.

4    O'Brien's background, did you uncover any indication

5    that he had failed to appear in court?

6             A      No.

7                    MS. GRADY:  Thank you, your Honor.  I

8    don't have any other questions.

9                    THE COURT:  Mr. Kornfeld, please.

10                   MR. KORNFELD:  Your Honor, I'll try not

11   to plow the same field.

12                   THE COURT:  That's okay.  That's okay.

13                   MR. KORNFELD:  And I would ask you to

14   take notice of the answers with respect to my client

15   as well.

16                   THE COURT:  Sure.

17                        CROSS-EXAMINATION

18   BY MR. KORNFELD:

19            Q      Special Agent Graves, first, with

20   respect to Mr. Hegarty, your investigation uncovered

21   no criminal history whatsoever anywhere in Europe,

22   correct?

23            A      No.

24            Q      No, meaning --

25            A      Yes.

1          Q       -- he has no criminal history?

2          A       I did not discover anything, criminal

3    history on Mr. Hegarty, no.

4          Q       Okay.  No history of violence?

5          A       No.

6          Q       No history of --

7                  THE COURT:  Can I interrupt just for a

8    second.  And Agent Graves, I apologize.

9                  When you say you found criminal history

10   with respect to Mr. O'Brien, is the source of the

11   criminal history the newspaper article?  Is that the

12   source of your criminal history?

13                 THE WITNESS:  No, your Honor, it's not.

14                 THE COURT:  Okay.  So this is just sort

15   of illustrative?

16                 THE WITNESS:  Yes.

17                 THE COURT:  Okay.  I just want to make

18   certain.  I don't know how many newspaper articles you

19   read that ferret out criminal history.  Go ahead.

20         Q       (By Mr. Kornfeld)  So you reached out to

21   Irish law enforcement authorities, correct?

22         A       Irish UK Interpol.

23         Q       Okay.  Nobody said anything bad about

24   Michael Hegarty, my client, did they?

25         A       No.

1      Q      And other than your statement that

2  somebody told you that these two gentlemen, your words

3  were may be members of the Rathkeal Rovers, you have

4  no evidence whatsoever linking Mr. Hegarty or Mr.

5  O'Brien to this group of itinerant Travelers, do you?

6      A      No.

7      Q      Okay.  You have no evidence that Mr.

8  Hegarty or Mr. O'Brien have engaged in fraud or ID

9  theft or any of the other things that these Rovers

10  apparently like to do, do you?

11      A      No.

12      Q      Now, there was some suggestion that my

13  client, Mr. Hegarty, also gives his address as Monks

14  Hill, Rathkeal County Limerick, Ireland, correct?

15      A      Yes.

16      Q      And there was some suggestion that that

17  address -- is there a suggestion that somehow that

18  address isn't specific or this address is intending to

19  somehow be deceptive to law enforcement?

20      A      No.

21      Q      Okay.  So, I mean, to your knowledge,

22  Monks Hill, Rathkeal is not exactly Dublin or New York

23  City.  It's not a big place, is it?

24      A      I don't know.  But, no.

25      Q      Okay.  And the bottom line is that this

1   is their address, and apparently that address means

2   something to people in Ireland, including the Irish

3   passport authorities, does it not?

4        A     Apparently so.

5        Q     Right.  There's nothing nefarious about

6   giving this address as Mr. Hegarty did, correct?

7        A     Not that I'm aware of.

8        Q     Are you aware of the fact that Mr.

9   Hegarty has lived in his home there for more than five

10  years, the last continuous five years, were you aware

11  of that?

12       A     No.

13       Q     You have no evidence that he gallivants

14  around Ireland or somehow tries to elude or somehow

15  keep secret his whereabouts, do you?

16       A     No.

17       Q     There was testimony about the travels of

18  these folks.  Nothing illegal about exercising your

19  passport and traveling for business, is there?

20       A     No.

21       Q     And in the course of your investigation

22  of the antique business, it's common, is it not, you

23  learned it's common, is it not, for folks to travel

24  around to buy the antiques where they are, correct?

25       A     I'm not familiar with the antique

1    business.

2            Q      Okay.  But you're not suggesting that

3    there is anything improper or illegal or nefarious

4    about traveling abroad as Mr. Hegarty and Mr. O'Brien

5    did, correct?

6            A      Correct.

7            Q      And you're aware of no travel restrictions

8    whatsoever by the Irish authorities, are you?

9            A      No.

10           Q      And you're aware of no false information

11   whatsoever provided to Irish or other immigration

12   officials, correct?

13           A      Correct.

14           Q      They came in -- both these gentlemen

15   entered the United States both in September and in

16   November using their legitimate identities, as far as

17   you know, correct?

18           A      As far as I know.

19           Q      And legitimately issued valid passports,

20   correct?

21           A      Correct.

22           Q      And you have no knowledge that they have

23   ever overstayed a visa in the United States, correct?

24           A      Not at this time.

25           Q      What do you mean "not at this time"?

1        A       Up until this point, I do not know

2    that.   The investigation continues.

3        Q       Well, you talked to an ICE agent, did

4    you not?

5        A       I did.

6        Q       You testified that the ICE agent kind of

7    ran their entry and exits out of the United States,

8    did that agent not?

9        A       No, that agent did not.

10       Q       Okay.  But absent you asking him to do

11   that, you have no information whatsoever that either

12   of these gentlemen have ever violated U.S. immigration

13   law, do you?

14       A       I do not.

15       Q       And regardless of whether they entered

16   New York, Milwaukee, Denver, it doesn't matter, does

17   it, for purposes of the legality of their entry?

18       A       No.

19       Q       Now, there was some testimony about this

20   antique business, and you're not contending, are you,

21   that the antique business -- that they aren't engaged

22   in the antique business, are you?

23       A       I'm not contending that.

24       Q       Okay.  And you have no reasons, there

25   were questions about, well, the whole family's

1    involved in this antique business.  Any knowledge

2    whatsoever that the antique business is an illegal

3    enterprise?

4          A    No.

5          Q    Any knowledge that any other family

6    members that are engaged in the antique business with

7    these two gentlemen have ever broken the law?

8          A    I have no information.

9          Q    When you queried you can Irish and other

10   foreign law enforcement authorities, nobody ever said

11   anything to the effect of, Well, this antique business

12   is just a front for rhino smuggling or other illegal

13   activities, did they?

14         A    There was no evidence to provide those

15   such statements.

16         Q    There was no evidence.  So in other

17   words, the answer to me question is, yes, there's no

18   evidence that they've done anything illegal in the

19   antique business?

20         A    Not that we're aware of.

21         Q    And you asked, did you not?

22         A    I asked what?

23         Q    I mean, you made queries to determine

24   whether or not this antique business is, in fact, a

25   legitimate business.

1          A      No.  I inquired as to their criminal

2    histories.

3          Q      Okay.  Are you aware of the fact that

4    Mr. Hegarty's father was engaged in the antique

5    business?

6          A      I found out through the follow-up

7    interview that he provided.

8          Q      That this is a family business?

9          A      I don't know that.

10          Q      That he was trained by his father?

11          A      I don't know that.

12          Q      Do you have any knowledge that he's done

13    anything else in his life other than engage in the

14    antique business?

15          A      I do not.

16          Q      Did you determine that Mr. Hegarty and

17    his family business deal with other legitimate dealers

18    besides the gentleman on South Broadway?

19          A      I don't know anything about their

20    antique business and dealings.

21          Q      Now, there was some questions.  You set

22    the price, $17,700, roughly, whatever the euros.  What

23    was it, 10,000 euros?

24          A      13,000 euro.

25          Q      13,000 euros.  But you set the market,

1   correct?  In your undercover capacity, you said, This

2   is how much money I want for the horns?

3          A     I said -- I gave them an amount that I

4   wanted for the horns, yes.

5          Q     And they met that amount, according to

6   your testimony?

7          A     They did not meet that amount.

8          Q     How so?

9          A     They went lower.

10         Q     And you agreed?

11         A     Yes.

12         Q     And during those negotiations, there was

13  no -- I mean, there was some haggling, it sounds like,

14  correct?

15         A     They told me they only had so much money

16  on them.

17         Q     And you accepted that?

18         A     Yes.

19         Q     Okay.  But there weren't discussions,

20  Well, you know, we -- to the effect of, Well, you

21  know, we know this business.  We deal in rhino horns,

22  and your prices are outrageous?

23              MS. McMAHAN:  Objection.  Discovery,

24  your Honor.

25              MR. KORNFELD:  The value is important,

 1    your Honor, because it goes to the potential penalty,

 2    and the government brought in Argentina.

 3              THE COURT:  You're getting -- I can

 4    understand it.  I don't understand why she brought up

 5    Argentina.  I don't know how this relates to the

 6    question of detention.

 7              MR. KORNFELD:  Well, one of the things

 8    we're going to argue, your Honor, is the agent

 9    testified as to the statutory max.  A brief analysis

10    of the Federal Sentencing Guidelines refers to 2B1.1,

11    and therefore value is very important.  I mean, if the

12    Court doesn't care, that's fine, but there was a

13    suggestion that well, these guys paid seventeen-seven,

14    but really they're worth more.  And what I'm trying to

15    forestall is an argument when we make our argument

16    about the guidelines that really the guidelines should

17    be higher because they're really worth, you know, a

18    billion dollars in China.

19              THE COURT:  I know, but the practical

20    reality is Mr. Graves says he doesn't know what these

21    are worth because he hasn't investigated the markets.

22    Any opinions he gave would be purely speculative.

23              MR. KORNFELD:  Fair enough.

24         Q    (By Mr. Kornfeld)  You gave a series of

25    answers with respect to email communications.  It's

1   true, is it not, that you never received any email

2   communication from anyone purporting to be Michael

3   Hegarty?

4           A    I did not.

5           Q    And no one else did associated with this

6   investigation, to your knowledge; is that correct?

7           A    That is not correct.

8           Q    Other than the email that you sent

9   Kathleen Hegarty, is that what you're referring to?

10          A    I'm referring to other emails that I

11   know about.

12          Q    Okay.  But the point is that Mr. Hegarty

13   was not the sender of any of those emails, was he?

14          A    His email address, if you're asking me

15   and I understand you correctly, was not at the top of

16   the email.

17          Q    And it wasn't on the email, was it?

18          A    His name may --

19               MS. McMAHAN:  Objection, your Honor.  I

20   object to this line of questioning.

21               MR. KORNFELD:  Your Honor, it goes to

22   the seriousness in his involvement.  My understanding

23   is he doesn't even have an email address and, in fact,

24   I will proffer to the Court he does not read or write

25   English, or any other language, for that matter.

1          THE COURT:  He doesn't read or write any

2     language at all?

3          MR. KORNFELD:  No.  He's verbally fluent

4     in English, but he is not -- he doesn't write or read

5     English.

6          THE COURT:  Okay.

7     Q    (By Mr. Kornfeld)  Did you know that,

8     Agent?

9     A    No.

10     Q    So I'll ask the question again.  Do you

11     recall receiving any email from Michael Hegarty?

12     A    I did not personally receive an email

13     from Michael Hegarty.

14     Q    Did you, yourself, send any email in

15     your undercover capacity to Michael Hegarty?

16     A    Not to Michael Hegarty.

17     Q    And in fact, most of the email

18     correspondence that is discussed in the affidavit in

19     support of the Criminal Complaint is between you and

20     Mr. Sullivan, is it not, or Mr. Sullivan and you?

21     A    Yes, it is.

22     Q    Okay.  And you testified that Mr.

23     Sullivan is a cousin of both these men?

24     A    Mr. O'Brien claimed to be a cousin to

25     Mr. Sullivan.

1          Q     Okay.  Other than that alleged

2    statement, you have no knowledge that Mr. Sullivan is

3    in any way related to Mr. Hegarty, do you?

4          A     I do not.

5                MR. KORNFELD:  Your Honor, may I have

6    one moment?

7                THE COURT:  Sure.

8          Q     (By Mr. Kornfeld)  Thank you, Agent.

9                MR. KORNFELD:  Thank you, your Honor.

10               THE COURT:  Ms. McMahan, redirect.

11               MS. McMAHAN:  Just briefly.

12               THE COURT:  Sure.

13                    REDIRECT EXAMINATION

14   BY MS. McMAHAN:

15         Q     You indicated your investigation

16   determined that there wasn't a specific address for

17   Michael Hegarty; is that correct?

18         A     Yes.  In some of the evidentiary work,

19   we found listed as a -- what we would call here in the

20   U.S. a specific address.

21         Q     And is it your understanding that these

22   two defendants do not live together?

23         A     I don't believe they live together.

24         Q     Okay.  Based on your investigation?

25         A     Yes.

59

1          Q     And again, that specific address was

2     more than what was provided during the investigation

3     or what was provided to Pretrial Services of this Monk

4     Hill?

5          A     Yes.

6          Q     And during your investigation, did

7     either of these defendants ever give you the name of

8     their antique business?

9          A     No.

10              MS. McMAHAN:  Thank you.  I have nothing

11     further.

12              THE COURT:  Agent, you can resume your

13     seat.  Thank you very much.

14              THE WITNESS:  Thank you, your Honor.

15              THE COURT:  Does the government have any

16     other evidence it wishes me to consider on the

17     question of detention?

18              MS. McMAHAN:  No, your Honor.  Thank

19     you.

20              THE COURT:  Let me hear from defense

21     counsel.  Any evidence, proffer or other information

22     you'd like me to consider?

23              MS. GRADY:  Additional proffer, your

24     Honor.

25              THE COURT:  Sure.

1               MS. GRADY:  In the Bail Report, it

2    references both Mr. O'Brien's father, that would be

3    Mr. Hegarty's father-in-law Richard O'Brien, Sr.,

4    along with Mr. William or Kathleen Holden.  She's

5    married to William Holden.  Both Mr. Holden and

6    Richard O'Brien, Sr. are here.  Do you need a moment?

7               THE COURT:  Sure.

8               MS. GRADY:  They're both here in the

9    courtroom.

10              THE COURT:  Okay.

11              MS. GRADY:  Mr. O'Brien obviously flew

12   out as soon as he learned of his son's arrest.  He is

13   a citizen of Ireland.  Mr. Holden is a, I want to say

14   legal resident -- sorry, naturalized U.S. citizen of

15   the United States, lives in Yonkers, New York and is

16   here to represent through me that he will take custody

17   of Mr. O'Brien in any way and Mr. Hegarty, that they

18   can come and stay with his family in New York and come

19   to Colorado whenever they are required to come to

20   Colorado for court.

21              His wife, Kathleen Holden, is also a

22   naturalized citizen of the United States.  And so I

23   think it's important to explain that a little bit more

24   than what is represented in the Bail Report.

25              Mr. O'Brien was present with me when Mr.

1    O'Brien and Mr. Hegarty were interviewed for the Bail

2    Report, and so he met personally with Mr. Williams.  I

3    have a little correction to make, which is that Mr.

4    O'Brien, Jr. does not have a million dollars in the

5    bank, he has a $1,000 in the bank.  That's a typo.

6              THE COURT:  I guess you were just going

7    to hear that.

8              MS. GRADY:  I should say that I'm not

9    entirely sure if I speak quickly as with our client.

10   Sometimes we don't always pick up the words that we're

11   speaking.

12             I think in terms of penalty, what's

13   really important here is that both of these men are

14   eligible for probation.  We can argue until we're blue

15   in the face about what value drives the ultimate

16   guidelines --

17             THE COURT:  I have no doubt.

18             MS. GRADY:  -- right.  But ultimately,

19   the possible sentence is zero to 10 years.  And I

20   think even the worst possible scenario, if the Court

21   were to ask Ms. McMahan, would be somewhere around 27

22   months.  And I'm not suggesting that that's correct at

23   all, but again the Court knows the drill on the

24   sentencing arguments.

25             You know, I'm a little surprised at the

1    Bail Report --

2                    MS. McMAHAN:  Objection.  Just a minute,

3    your Honor, if I may.  I think this is an offer of

4    proof, not argument at this point, so I'm wondering

5    where we're going with arguing about the ultimate

6    sentence.

7                    THE COURT:  I think it's a very fine

8    line.

9                    MS. McMAHAN:  Okay.

10                   THE COURT:  But I think I can discern

11   the differences.

12                   MS. McMAHAN:  Thank you.

13                   MS. GRADY:  We'll certainly continue to

14   disagree about the ultimate sentence.

15                   THE COURT:  Sure.

16                   MS. GRADY:  I'm not suggesting that we

17   not -- any of the lawyers here --

18                   THE COURT:  Since we haven't even had a

19   preliminary hearing, we're getting way ahead of

20   ourselves.

21                   MS. GRADY:  Right.  I just want to

22   address the Probation Reports' recommendations, and

23   specifically, if it's not abundantly clear, I'm sure

24   it is, there is no issue here about whether or not Mr.

25   O'Brien poses a threat to the community if released.

1   The question here is whether or not the Court can

2   reasonably rely that he will appear in court based

3   upon the information that the Court has before it.

4   The fact that this -- I think it really misstates the

5   case when the Bail Report says the case involves

6   smuggling goods from the United States.  That didn't

7   happen here.  It certainly involves taking possession,

8   but not smuggling goods from the United States.  And

9   regardless, that particular crime does not create any

10  presumption that a person is not likely to appear in

11  court.

12          The fact that his financial ties are not

13  in the District of Colorado has no bearing on whether

14  or not he is going to appear in court.  He has family

15  ties, good, strong family ties in the United States,

16  and they are quite devoted to him, and that's why Mr.

17  Holden is here to make that representation.  The fact

18  that he is a citizen of Ireland doesn't make him any

19  more or less -- certainly any more of a flight risk.

20  And indeed, to the extent that there is some

21  indication of criminal history, and I'm trying to be

22  general here, there's certainly no indication that he

23  has not honored court rules elsewhere, to my

24  knowledge.  And I see you shaking your head, but I

25  just don't.

1                    THE COURT:  No, no, no.

2                    MS. GRADY:  But I don't know what to

3    call a conviction in Belgium.

4                    THE COURT:  No.  I was just reminded

5    that you had sort of belittled the Belgium due

6    process.  So whatever minimal due process Belgium has,

7    he apparently honored.

8                    MS. GRADY:  Perhaps they'll try to burn

9    me at the stake later, but it's for today --

10                    THE COURT:  No, no, no.

11                    MS. GRADY:  I don't know, really, and I

12    don't want to guess.  I should note, I don't think Ms.

13    McMahan will disagree, the passports that were used to

14    enter the country are locked up someplace, so they are

15    already surrendered.

16                    I think it is quite significant that the

17    consulate general is willing to step in and help us do

18    whatever we can to extend the legitimacy of their

19    stay.  If, in fact, Mr. O'Brien appeared here on a

20    visa or was an American citizen or a resident, we

21    wouldn't even be here having this bond hearing because

22    of the nature of the offense.  So I think that all of

23    those things are important to take into consideration.

24    I hope now it's abundantly clear, and I'm sorry we

25    took up so much time establishing it, that they were

1    legitimately here in the United States to purchase

2    antiques, or at least what they believed to be

3    antiques.  So this is what I am going to suggest to

4    the Court, which is this.

5              The fact that Mr. O'Brien, and I should

6    say Mr. Hegarty, as well, are both currently legally

7    in the United States.  They have violated no

8    immigration law, and so if the Court were to release

9    them they would still be here legally in the United

10   States.  They would have no means to leave the United

11   States.  In fact, they probably without a passport

12   because they have Irish driver's licenses, although

13   I'm not sure where those are right now, they probably

14   can't even fly in the internal United States, my

15   guess, without the proper indication.  So they would

16   have to travel by car or train to get back and forth,

17   and his uncle is quite willing to do that.  If the

18   Court's not -- I think that frankly the best avenue

19   here is to release Mr. O'Brien, and I'll let Mr.

20   Kornfeld speak for his client, to his uncle in

21   Yonkers, because frankly that would cost them less

22   money to do that, and then they could get back and

23   forth here.

24              If the issue -- if the case is not

25   resolved before the expiration of the passport, which

1    would be 90 days from the date of their last entry,

2    November 12th, the Embassy in Ireland is already

3    working on helping us make those arrangements to

4    extend their stay.  Because the fact is they've done

5    nothing to justify being detained and to be in

6    violation of our immigration laws at this point.  So

7    they are here legally, and they should be released.

8    The fact is that now they are on, clearly on the radar

9    of both the Embassy and, I think it was New York, the

10   other Embassy address that was on the letter that Ms.

11   McMahan tendered, as well as the Embassy in

12   San Francisco.  And so there's no way the Embassy is

13   going to lose track of them, or I think they have

14   committed to helping us.

15            THE COURT:  You will agree at this point

16   we are no longer entertaining a proffer.  We can agree

17   that we now have segued into argument.

18            MS. GRADY:  Okay.  I suppose.  I'm just

19   talking about the meaning of that letter.

20            THE COURT:  No, I understand.

21            MS. GRADY:  I'm just making a suggestion

22   here as to what I think is a reasonable alternative to

23   detention and certainly the least restrictive of

24   conditions that the Court can impose.  And so that's

25   my point here is that there are conditions and a

1   combination of conditions which the Court can impose.

2            It is possible, and I say this again

3   based upon the representations of Richard O'Brien,

4   Sr., that if the Court were not comfortable with Mr.

5   O'Brien leaving the state of Colorado, that Richard

6   O'Brien, Sr. could put him up, and we could make

7   arrangements to put him up in an apartment here.  And

8   if the Court felt that that was necessary, we would

9   make those -- those arrangements would be made.

10           I would also add that to the extent that

11  anyone's concerned that my client is going to

12  disappear, we could put an ankle bracelet on him and

13  subject him to GPS monitoring.

14           THE COURT:  Mr. Kornfeld.

15           MR. KORNFELD:  Your Honor, probably the

16  only thing, and this is argument, you've heard the

17  proffer, probably the only thing that I'd disagree

18  with Ms. Grady is I will not say anything disparaging

19  about Belgium today, because I don't have to.

20           THE COURT:  No, I wouldn't do that,

21  either, on the chance you have to try to get into

22  Belgium.

23           MR. KORNFELD:  Because I don't have to.

24  Your Honor, I agree with Ms. Grady, clearly, if these

25  gentlemen were U.S. citizens or even permanent

1    resident aliens, we probably wouldn't be here.

2    Essentially, the report reads that they are a risk of

3    flight because they're not U.S. citizens, and that

4    that's the point.  But to Ms. Grady's point, I don't

5    think they can leave if they want to leave.  They

6    can't get on a plane domestically, they can't get on a

7    plane internationally, they can't get into Mexico or

8    Canada, and they can't swim back to Ireland.  So

9    effectively, they are stuck.

10              The issue of their immigration status, I

11   don't think is -- you know, if ICE wanted to detain

12   them under their rules and regulations, then they can,

13   but right now Ms. Grady's point they are legal, and

14   more fundamentally, I spoke personally with Mr.

15   Staunton, the consul, and also the vice consul, who's

16   name is also Mr. O'Brien, no relation, they have dealt

17   with this issue before, and the first thing Mr.

18   Staunton asked me was kind of a general timetable,

19   although frankly he was as familiar with the Federal

20   Speedy Trial Act as I am, given his position.  So

21   while he certainly made it clear that it is not their

22   role or their intention to interfere with our system,

23   that if we, in fact, get close to the 90 days they

24   have dealt with that issue, and they will render

25   assistance to their citizens as they are able and as

 1    they see fit.  And as he also pointed out to me,

 2    they've got plenty of time because they're roughly 10

 3    days into the 90.

 4                   So the family support also through Mr.

 5    O'Brien, the father-in-law, extends through Mr.

 6    Hegarty as well, and he also has prior relationship

 7    with the family in New York.  He has stayed with them,

 8    they know him.  That seems to me to make the most

 9    sense that they be with family and have that support

10    rather than be in Colorado, but if they need to be in

11    Colorado, the game plan would be for them to secure

12    accommodation and to do that together.

13                   With respect to Mr. Hegarty, there's

14    just nothing there.  There's no priors, there's no

15    nefariousness, there's no disrespect for the law,

16    there's no violence, there's no prior illicit conduct,

17    there's nothing.

18                   You've heard the argument about the

19    weight of the evidence and the potential penalties.  I

20    don't need to go over that again, but the bottom line

21    is I also would urge the Court that we have made

22    humbly some suggestions that might constitute

23    combinations of conditions.  Obviously, the Court can

24    impose anything it wishes, and I will tell the Court

25    that whatever conditions it feels is necessary, if

1   you're inclined to do that, we will gladly embrace and

2   abide by.

3          The cultural shock of being in a prison

4   in a jail for the very first time, let alone the very

5   first time in a foreign country, I can't even express

6   how difficult that's been for Mr. Hegarty and Mr.

7   O'Brien, and given all the factors that the Court has

8   heard, certainly it seems that there are conditions or

9   combinations that will reasonably assure their ongoing

10   participation in this case.  Thanks, your Honor.

11          THE COURT:  Ms. McMahan.

12          MS. McMAHAN:  Thank you, your Honor.  So

13   are we officially in argument at this point?

14          THE COURT:  I think you're officially

15   going to get the last word.

16          MS. McMAHAN:  Your Honor, briefly, the

17   government opposes any release of these two

18   defendants, with the understanding that if they are

19   released, there is concerns that they will never

20   appear in court again.

21          THE COURT:  How?  Do you want to respond

22   to the arguments that they can't fly, they can't leave

23   the country?  Explain to me the flight risk.  I mean,

24   I suppose arguably there is the possibility they could

25   swim, and that might suggest a reason not to let them

1    stay in Yonkers because it would be closer to their

2    part of departure.  But --

3                MS. McMAHAN:  Your Honor, I would agree

4    with those analyses if you were looking at the legal

5    means of leaving this country.  And if the Court will

6    recall, if you look at the Complaint, the reason these

7    two individuals came into this country is for illegal

8    activity.  In speaking with ICE, Special Agent Jeff

9    Lembke, he indicated to me that there's a possibility

10   that a detainer could actually be filed on both of

11   them.

12               THE COURT:  But Ms. McMahan, I'm not

13   going to make a decision on detention based upon a

14   possibility what ICE may or may not do.

15               MS. McMAHAN:  But it didn't seem

16   appropriate to me, your Honor, because what would

17   happen is under the program for which they are in the

18   country, the Visa Waiver Program, they would not go in

19   front of a judge.  And if they are released and then

20   the detainer hits and they are taken into custody,

21   then obviously they would be returned back to

22   Ireland.  And I know that that is a situation that

23   would not assist this criminal case at all, but I

24   would note for the Court several things that should be

25   of concern about whether or not there are conditions

1   or a combination of conditions and whether or not the

2   conditions that are offered to this Court are even

3   viable.

4              First of all, is there some reason we

5   haven't heard from the individual whose house they

6   will stay in?  He has not taken the stand, and Ms.

7   Grady made an offer of proof, but we don't have many

8   specifics about him or about --

9              THE COURT:  I can tell you at this

10  juncture, I'm not inclined to release them to Yonkers.

11             MS. McMAHAN:  Is the Court inclined to

12  release them to a halfway house?

13             THE COURT:  No.

14             MS. McMAHAN:  So the Court is inclined

15  to allow the father to come over to the United States

16  and put up a place for these individuals to stay in?

17             THE COURT:  Right now it would be my

18  inclination to release these defendants on conditions

19  of bond which would include surrendering their

20  passport, which would preclude them from obtaining any

21  other travel documents, which would restrict their

22  travel to the state of Colorado, which would require

23  them to submit to electronic monitoring.  Now, if they

24  submit to electronic monitoring and they're taken into

25  custody by Immigration, then you can immediately step

1    in, and I can issue whatever orders are necessary.

2    I'm not -- we hear this all the time.  That somehow

3    once people enter into the custody of ICE, they

4    somehow disappear from any and all power known to

5    man.  I'm not prepared to buy that argument.

6                 MS. McMAHAN:  Your Honor, I'm not asking

7    you to, but what I'm asking you to listen to is the

8    fact that I don't think those combination of

9    conditions will ensure the Court that these

10   individuals would appear for court.  The Court is

11   assuming something right off the bat that I don't

12   think it's correct concerning these two particular

13   defendants, and that is that they are law abiding

14   citizens who won't look for ways other than the legal

15   means to leave this country.  As the Court is aware --

16                 THE COURT:  In fairness, though, Ms.

17   McMahan, and this is why to some extent I'm troubled

18   by this procedure.  I am, to some extent, troubled by

19   your last comment, because what you're suggesting is

20   that there is no evidence that they're law abiding

21   people.  I have not had a preliminary hearing in this

22   case at all.  Right now, to the contrary, there's no

23   evidence that they're not law abiding people.  I have

24   not had a probable cause hearing, the government has

25   studiously declined to establish probable cause

1   today.  Right now, I'm not sure this case is going to

2   get off square one on Monday.  I'm not inclined to

3   detain people, particularly inclined to detain people

4   in advance of a probable cause hearing.  Because right

5   now the government has not attempted, nor has the

6   government offered to present for my consideration

7   evidence suggesting there's a reasonable probability

8   that these gentlemen committed a crime.  You're asking

9   me to detain people without ever having a probable

10   cause hearing.  I'm troubled by that.

11              MS. McMAHAN:  But then, your Honor, I

12   would ask if that is what the Court is troubled with,

13   there is a signed affidavit which contains the

14   probable cause determination by Judge Boland that you

15   have in front of you, but I would ask to reopen this

16   case and call Special Agent Curtis Graves.  And if the

17   Court is uncomfortable making this determination

18   thinking that there is no evidence to support these

19   charges, we will establish probable cause.

20              THE COURT:  No.  I think there is, but,

21   Ms. McMahan, look.  I'm inclined to release these

22   gentlemen, and I realize the government disagrees with

23   me.

24              MS. McMAHAN:  We do, your Honor.

25              THE COURT:  And I absolutely respect the

1   government's right to disagree with me.  That's your

2   job, and I wouldn't think any less of you for doing

3   your job.

4                MS. McMAHAN:  Okay, your Honor --

5                THE COURT:  But at least at this

6   juncture, I am not convinced that detention is

7   warranted, notwithstanding --

8                MS. McMAHAN:  Is the part of that

9   consideration that the Court is determining today

10  because you have not heard as to the preliminary

11  hearing?  And if so --

12               THE COURT:  No.  My determination today

13  would be based on a number of factors.  There is no

14  evidence that these defendants pose any danger to the

15  community.  There is no evidence, at least at this

16  point in time, that Mr. Hegarty has any criminal

17  record at all.  I can establish his ties to the

18  community by virtue of imposing conditions which

19  establish those ties by virtue of the fact that he

20  can't leave the state, by virtue of the fact that I

21  can subject them both to electronic monitoring.  I can

22  create, to some extent, ties to this community.  I'm

23  not persuaded by some possibility of Immigration

24  stepping in that that necessarily means that these

25  gentlemen have to be detained.

1            MS. McMAHAN:  Well, your Honor, I would

2    like to first of all call Special Agent Curtis Graves

3    back to the stand to reestablish -- to do the

4    preliminary hearing because that's obviously important

5    to this Court.  And then secondly, I would like to be

6    heard as to argument as to the reason that there are

7    no ties in this community, and I'll be perfectly --

8            THE COURT:  I'm happy to hear argument

9    about whether they're not.  Listen.  I've read the

10   Pretrial Services Report.  I know what ties they have

11   to the community.  At least at this juncture they're

12   nonexistent.  You don't need to put him back on the

13   stand to tell me what I already know.

14           MS. McMAHAN:  Your Honor, but you

15   expressed concern about not having information about

16   the crimes --

17           THE COURT:  No, I mean, I understand.

18   But Ms. McMahan, to some extent this is what's

19   difficult about this process, and that's why I started

20   this morning -- well, it's about to be this afternoon,

21   by saying how do you want to proceed.  Now, if you

22   want to put Mr. Graves back on the stand to present

23   more evidence that he didn't have before, I suppose

24   technically that's fine, although you're going to

25   raise the ire of all those people who are waiting for

1    my time and attention and have been waiting for quite

2    sometime.  The government made a decision on how to

3    proceed.  The government made that decision in front

4    of Magistrate Judge Boland.  I will tell you honestly,

5    even if your agent gets back on the stand, my

6    inclination is not to detain these gentlemen.

7                     Let's just say for purposes of

8    discussion today, let's say hypothetically I were to

9    find probable cause, I would still not detain these

10   two gentlemen.  So if you want to save your ammunition

11   for Monday, you're certainly free to do that.  I'm not

12   inclined to detain these gentlemen.  I do not believe,

13   based upon the factors set forth in the statute, based

14   upon the fundamental theories underlying the statute,

15   I do not believe that detention is warranted when I

16   can impose conditions that I think reasonably assure

17   the appearance of these defendants for further

18   proceedings.

19                     MS. McMAHAN:  And, your Honor, if I may

20   inquire, have you considered a halfway house?  Because

21   if you were considering a combination of conditions

22   that would allow the government to know if, in fact,

23   they are making preparations or getting ready to

24   leave, it seems like a halfway house would be the more

25   appropriate placement.

1          THE COURT:  How?  I don't necessarily

2  follow that logic.

3          MS. McMAHAN:  Because we know

4  immediately when they don't report back.

5          THE COURT:  But if they're on electronic

6  monitoring, I have the same immediacy.

7          MS. McMAHAN:  It can be --

8          THE COURT:  If I, in fact, tell them

9  they're required to stay at the apartment that Mr.

10  Holden gets for them and they must stay in that

11  apartment unless they leave to visit their counsel or

12  come to court, that arguably gives me even more

13  protection than staying at a halfway house.  Because

14  the halfway house they could theoretically at least

15  walk out the door and no alarms or buzzers will go

16  off.  They can't get a job.  They can't get a job,

17  they can't travel.  They've got nothing to do except

18  sit in an apartment and watch American TV which could

19  be considered cruel and unusual punishment by some

20  people.

21          MS. McMAHAN:  Your Honor, for the

22  record, the government contends that these are

23  citizens of the Republic of Ireland and that they are

24  facing --

25          THE COURT:  I don't think I could

1    penalize them for that.

2              MS. McMAHAN:  No, and that they are

3    facing serious charges in the United States.  That the

4    weight of the evidence is strong because there's an

5    undercover officer who is an ear and eye witness to

6    their illegal activity, that they are facing

7    imprisonment, they clearly have ties all around the

8    world and the United States, as evidenced by their

9    passports, they do travel, and that there are ways

10   other than legal means by passport to leave the United

11   States.  It's the government's position that the

12   weight of the evidence is strong, that the defendants

13   have absolutely no ties to this community, no jobs, no

14   family in Colorado.  They are facing a possible prison

15   term of approximately two years plus, depending upon

16   the value of the rhinoceros horns, and that this makes

17   them a serious flight risk.  We are not proceeding

18   under danger to the community but only a flight risk.

19   And it is the government's concern that there are

20   allegations that one of them has a prior conviction

21   similar to the conviction in this case, conspiracy to

22   smuggle, but they are a part of an itinerant group out

23   of --

24             THE COURT:  Stop.  They aren't.  Your

25   own witness says there is a group in Ireland called

1    the Rathkeal Rovers, sounds like a musical group

2    playing at the pub, but setting aside that, what your

3    witness specifically said, because I wrote it down, he

4    said when he spoke to somebody in Ireland, and the

5    person in Ireland said they may be part.

6                MS. McMAHAN:  Exactly, your Honor.

7                THE COURT:  I'm not going to detain

8    people on the speculation that they're part of the

9    Rathkeal Rovers.

10                MS. McMAHAN:  Your Honor, you have to

11   consider all relevant information concerning these two

12   individuals.  And if the Court would read Government

13   Exhibit 1, which I think we have closely established

14   is Mr. O'Brien, defendant O'Brien sitting in the

15   courtroom, you will see about the ties to a group that

16   travels around Europe.  And then what I think is most

17   interesting about Government's Exhibit 1 and 2 is how

18   quickly Belgium justice, if it is to be entitled that,

19   is served.  Apparently, one article was on May 9,

20   2004, and he was serving two years in prison for that

21   conviction on 10 of June 2004.  So I thought that was

22   pretty amazing.  But nonetheless, that gives the Court

23   standard or concrete information of ties to a group

24   that travels around conspiracy in Government's Exhibit

25   1 and 2.  The defendant himself in his interview

1    following his arrest indicated that he was convicted

2    of that to Special Agent George Morrison.

3              THE COURT:  I understand.

4              MS. McMAHAN:  And finally, the most

5    telling aspect of this is the Court is assuming that

6    if you come up with a combination of conditions, that

7    these defendants will remain in the United States.

8    They had tickets to depart from the United States on

9    November, I believe it was the 18th.  They had no

10   intent to remain within the United States.  For all of

11   those reasons, the government asks that they be

12   detained.

13             THE COURT:  That wouldn't surprise me

14   that they had no intent to remain in the United

15   States.  They were going to go back to Ireland which

16   is where they live and they conduct their business.

17   So the fact that they were planning on leaving the

18   United States, rather than demonstrating a flight risk

19   suggests that they had a real commitment to going

20   home.  That in and of itself isn't nefarious or

21   suspicious.

22             MS. McMAHAN:  Okay.  Thank you.  Does

23   the Court have any questions of me?

24             THE COURT:  No.

25             MS. McMAHAN:  Thank you.

1                THE COURT:  Here's what I'm going to

2    do.  I appreciate the arguments that both sides have

3    made.  I think Ms. McMahan has raised some interesting

4    questions, but raising interesting questions does not

5    in my mind establish a basis for detaining these two

6    individuals when there are alternative conditions that

7    could be imposed.  I'm not trying to make light of the

8    instant offense.  I'm not trying to suggest that the

9    Court is disregarding the government's arguments, but

10   in this case, given the offense, given the potential

11   penalties, given the fact that there's no danger to

12   the community, given the fact that I believe I can

13   impose conditions which substantially and reasonably

14   reduce the risk of flight, I'm going to release these

15   two defendants under the following conditions.

16                I'm going to impose a $10,000 unsecured

17   bond.  Gentlemen, you don't have to post any of that

18   money.  If you violate any conditions of release, you

19   could potentially forfeit that amount.

20                I'm going to require that the

21   defendants, I think I know that they don't have their

22   passports, but out of an abundance of caution, I'll

23   require the defendants to surrender their passports.

24   I'm require the defendants to surrender any additional

25   travel documents they might have.

1            Gentlemen, while you're on conditions of

2   bond, you may not obtain any passports or alternative

3   travel documents.  To the extent the defendants have

4   driver's licenses from Ireland or otherwise, I'll

5   require that those driver's licenses be suspended.

6            Ms. McMahan, you are certainly free to

7   contact whatever government agency is responsible for

8   putting these gentlemen on the appropriate lists so

9   they can't get on a commercial airplane.  I'm

10  suggesting you can do that.

11           Now, the defendants' travel is

12  restricted to the state of Colorado.  The defendants

13  may not leave the state of Colorado without prior

14  permission from the Court.  The defendants may not --

15  I will require the defendants to establish a residence

16  here in Denver, Colorado.  The defendants may not be

17  he released until that residence is established, until

18  the residence is approved for electronic monitoring.

19  I'll require the defendants to submit to electronic

20  monitoring at their expense.  The defendants will be

21  required to reside in that apartment twenty-four hours

22  a day, seven days a week.  They may only leave that

23  apartment to meet with counsel or to appear for

24  court.  Any other departures from the apartment will

25  have to get the permission from the supervising

1    officer.  I realize at some point they may actually

2    want to go out and buy food.  I'm not suggesting that

3    they can't buy food, but they'll have to coordinate it

4    with the supervising officer.

5              In short, gentlemen, I expect you to be

6    in that apartment, I expect you to be governed by

7    electronic monitoring unless you get specific

8    permission otherwise.  And just be on notice that the

9    permission will probably not be liberally granted.

10             The defendants may not act as informant

11   for any law enforcement agency without prior court

12   permission.

13             To the extent that the defendants are

14   picked up by Immigration detainer or Immigration

15   authorities, the government is obviously free to come

16   back to the Court, demonstrate that that is new

17   information that is not known today, and the

18   government can certainly ask the Court to reconsider

19   the question of bond.

20             Are there any other conditions,

21   recognizing that the government does not agree with my

22   general presumption of releasing them?  But assuming

23   that we've gotten over that hurdle, Ms. McMahan, are

24   there other conditions that you would ask me to

25   impose?

1            MS. McMAHAN:  Your Honor, can I have --

2    I would like an opportunity to speak with Pretrial

3    Services about that.

4            THE COURT:  Well, here's the reality of

5    what's going to happen, and gentlemen, I don't want to

6    mislead you.  You're going to stay in custody today.

7    It's really that simple.  Because until an apartment

8    is secured by someone on your behalf, until that

9    apartment qualifies for electronic monitoring, and

10    until the equipment is installed, you will have to

11    stay in custody.  Once I'm advised that an apartment

12    is obtained, once I'm advised that electronic

13    monitoring is available, then you'll be returned to

14    the Court, and at that time you'll be released.  In

15    the meantime, Ms. McMahan, if there are additional

16    conditions you'd like me to consider, you're certainly

17    free to consult with Pretrial Services, you're

18    certainly free to consult with defense counsel.

19            MS. McMAHAN:  And your Honor, I was also

20    going to ask that their release be stayed until I make

21    a decision as to whether or not we're going to be

22    appealing this as well, but it sounds like we'll have

23    the requisite days.

24            THE COURT:  Well, and I can't release

25    them until the conditions are satisfied.

1              MS. McMAHAN:  Okay.

2              THE COURT:  So practically speaking,

3    it's stayed for logistic reasons more than anything

4    else.  But I do, at least at this juncture based on

5    the information presented today and the information of

6    which I'm taking judicial notice, I believe the

7    conditions of release can be imposed, and it would be

8    my intention to do so.

9              From defense counsel, any objection to

10   the conditions I'm proposing, at least from this

11   juncture?  Any objection?

12             MS. GRADY:  No, your Honor.

13             MR. KORNFELD:  No, your Honor.

14             THE COURT:  All right.  I'll remand the

15   defendants back to the custody of the United States

16   Marshals.  When are we reconvening on Monday for a

17   preliminary hearing?

18             MR. KORNFELD:  One-thirty.

19             THE COURT:  All right.  I'll remand the

20   defendants.  The defendants should be returned to

21   court at one-thirty on Monday for a preliminary

22   hearing.  In the meantime, I'll remand them back to

23   the custody of the United States Marshal.  Thank you.

24             MS. GRADY:  Thank you, your Honor.

25        (Recess taken at 12:01 p.m.)

1                        CERTIFICATE

2              I certify that the foregoing is a

3   correct transcript to the best of my knowledge and

4   belief (pursuant to the quality of the recording)

5   from the record of proceedings in the above-entitled

6   matter.

7         Dated this 15th day of December, 2010.

8

9

10            /s/Adrienne Whitlow
        _____
11       8000 E. Girard Ave., #109
           Denver, CO  80231
12          (303) 695-1121

13

14

15

16

17

18

19

20

21

22

23

24

25