IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 10-cr-00588-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JOHN SULLIVAN,
2.    **RICHARD O'BRIEN**,
3.    **MICHAEL HEGARTY**,

      Defendants.
_____

**DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT**
_____

Richard O'Brien and Michael Hegarty, by and through undersigned counsel,

Virginia Grady and Rick Kornfeld, respectively, move to dismiss the indictment in its

entirety, and as grounds state as follows:

## I.   *Introduction*

In the Commerce City, Colorado home of a paid confidential informant, Richard

O'Brien and Michael Hegarty purchased rhinoceros horns from an undercover United

States Fish and Wildlife agent.  The horns were retrieved from storage units maintained

by the United States Division of Fish and Wildlife, and are considered to be quite old,

possibly older than the international treaty which protects the rhinoceros.  Within

seconds of the defendants' purchase and exit, and before they were settled in their car,

they were arrested.  At the time of their arrest, the defendants had done nothing that

would constitute a crime; their travel to the United States was legal, their bringing of

currency (Euros) to the United States was legal, and their purchase and possession of

the rhinoceros horns was legal.  What, then, criminalizes this innocent conduct?

## II.      The premise of this prosecution.

This is not an Endangered Species Act prosecution. All three counts of the

indictment operate through 18 U.S.C. § 554.  Count 1 charges conspiracy to violate 18

U.S.C. § 554, and 18 U.S.C.§ 1956 (money laundering). Count three is the substantive

money laundering count, premised on an "intent to promote the carrying on of a

specified unlawful activity," namely, a violation of 18 U.S.C. § 554. Count Two

substantively charges a violation of 18 U.S.C. § 554.  In its entirety, the statute reads as

follows:

### §554.  Smuggling goods from the United States

(a) **In general**. — Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than ten years, or both.

As explained below, 18 U.S.C. § 554 was only recently enacted, not to protect

endangered species, but to combat terrorism.

## III.     The unnatural marriage of the anti-terrorism export statute to the Endangered Species Act

"**CITES**" is the acronym for the Convention on International Trade in

Endangered Species of Wild Fauna and Flora, 27 U.S.T. 1087, T.I.A.S. No. 8249, (also

known as "the Convention"). The treaty was codified in 1973 as the Endangered

Species Act in Title 16, United States Code Section 1537 et.seq., and implemented via

various subparts of Volume 50 of the Code of Federal Regulation.[1]  The defendants are

not directly charged with violating the Endangered Species Act, presumably because

the government lacks the essential nexus to interstate and foreign commerce.  Nor are

they charged with Conspiracy to violate the Act, or Attempt to violate the Act (16 U.S.C.

§ 1538(g)), presumably because the government lacks the necessary evidence of an

overt act and a substantial step toward the commission of the crime.[2]

Instead, the indictment identifies 16 U.S.C. §§ 1538(a)(1)(E), (G) and (c) and the

corresponding regulations (50 C.F.R. §§ 14.63, 17.21(e), 17.31(a), and 23.13), as one

of the limitless *criminal objectives* of 18 U.S.C. § 554.  Recall that the statute makes it a

felony to export or attempt to export "any merchandise, article, or object contrary to any

---

[1]  The treaty is not self-executing.  *See United States v. Ivey*, 949 F.2d 759, 764 (5th Cir.
1991).  Instead, each member country is responsible for implementing the treaty
through its domestic laws and regulations. "The regulations were promulgated to
implement the ESA, which was itself passed, in part, to implement the Convention."
 *Castlewood Products, LLC v. Norton*, 365 F.3d 1076, 1084 (D.C. Cir. 2004); *see also
United States v. Koczuk*, 252 F.3d 91, 93 (2d Cir. 2001). As has been pointed out by
numerous federal courts, Congress implemented CITES through the Endangered
Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531, *et seq.  See United States v. Norris*,
452 F.3d 1275,1277-78 (11th Cir. 2006); *Norton*, 365 F.3d at 1079; *Koczuk*, 252 F.3d at
93; *Defenders of Wildlife v. ESSA*, 659 F.2d 168, 174-75 (D.C. Cir. 1981); *see generally
United States v. Grigsby*, 111 F.3d 806, 814-16 (discussing "CITES: Implementing and
Interrelating Legislation").

[2]  Nor are the defendants charged under the very similar Lacey Act, presumably
because the Act also requires that the defendants move the species in interstate or
foreign commerce. "The **Lacey Act**, codified as amended at 16 U.S.C. §§ 3371-3378,
prohibits traffic in wildlife taken, possessed, transported or sold in violation of any
federal, state, or foreign law." *United States v. Bramble*, 103 F.3d 1475 (9th Cir. 1996).
Interestingly, the criminal penalty for a Lacey Act violation that does not involve actual
export is not more than one year in prison. 16 U.S.C. § 3373(d)(3)(B).

law or regulation of the United States," or to "receive[], conceal[], buy[], sell[], or in any [other] manner facilitate[] the transportation, concealment, or sale of such article prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States."

The combination of 18 U.S.C. § 554 with 16 U.S.C. § 1538 produces a bizarre breach of due process.  A violation of 16 U.S.C. §§ 1538(a)(1)(E), (G), (c)(1) and the corresponding regulations (50 C.F.R. §§ 14.63, 17,21(e), 17.31(a), and 23.13) – the alleged criminal objective –  constitutes a *misdemeanor*, punishable by no more than one year in prison. 16 U.S.C. § 1540(b)(1).  A violation under 18 U.S.C. § 554 constitutes a *felony*, punishable by up to ten years in prison.  In sum, through a felony statute, the grand jury has charged the defendants with committing an act which is specifically codified as a misdemeanor (16 U.S.C. § 1538(a)(1)(E), (G) and (c)), or with committing an act with the knowledge of an intent to commit an act which is specifically codified as a misdemeanor.[3]  This unconstitutional mismatch is possible in the government's universe because the statute reaches "any merchandise, article, or object," and permits, as its criminal objective, a violation of "any law or regulation of the United States."  The statute was not, however, intended to reach conduct already codified as a misdemeanor (no felony is), and specifically not intended to regulate conduct already prohibited under the Endangered Species Act.  As applied in the instant indictment, the statute is unconstitutional.

---

[3]  Conspiracy to violate § 1538 of the Endangered Species Act would also be a misdemeanor, since 18 U.S.C § 371 provides, "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

**IV.     The "Unconstitutional as Applied" doctrine**

The "unconstitutional as applied" challenge to statutory construction "acknowledges that the law may have some potential constitutionally permissible applications, but argues that the law is not constitutional as applied." *New Mexico Youth Organized v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010). The challenge invokes the due process clause of the Fifth Amendment of the United States Constitution, and is limited to litigants who are directly affected by the statute as applied. *Secretary of State of Maryland v. Munson*, 467 U.S. 947, 965-66 (1984). The inquiry focuses on unintended consequences of statutory interpretation, and the question of whether the defendants' conduct "falls squarely within the hard core of the statute's proscriptions," *Broadrick v. Oklahoma* 413 U.S. 601, 608 (1973);  *see also U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973). When the "hard core" of the statute clearly reaches beyond its Congressional intent – indeed, beyond reason and common sense – the due process clause must be invoked to protect the accused.

The concept of due process is derived from the Magna Carta.

> The provision was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government.' The principle and true meaning of the phrase have never been more tersely or accurately stated than by Mr. Justice Johnson in *Bank of Columbia v. Okely*, 4 Wheat. 235-244: 'As to the words from Magna Carta, incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government,

unrestrained by the established principles of private right and distributive justice.

*Hurtado v. California*, 110 U.S. 516, 527 (1884).

In contrast to an "as applied" challenge, a facial or "overbreadth" challenge to the constitutionality of a statute  is limited to cases involving protected speech and where "the statute on its face and in all its applications falls short of constitutional demands." *Nat'l Ass'n of Letter Carriers*, 413 U.S. at 967. For the reasons cited below, the indictment in this case fails without need of a ruling which cuts such a wide swath.

**V.    As applied in the instant indictment , the anti-terrorism export statute flies in the face of constitutional due process.**

1.    *18 U.S.C. §554 has nothing to do with the CITES treaty or endangered species; it was enacted to protect America's ports from acts of terrorism.*

The illegal export/smuggling statute was enacted in 2006 as a part of the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. 109-177, § 311(a), 120 Stat. 192, 242 (2006) ("the Reauthorization Act").  *See United States v. Alghazouli*, 517 F.3d 1179, 1186 (9th Cir. 2008).  The overall purpose of the Act was to amend and re-authorize the 2001 USA PATRIOT Act legislation, passed in the immediate aftermath of the September 11th terrorist attacks.

As introduced in the House of Representatives, the Reauthorization Act did not originally include section 311 (ultimately codified at 18 U.S.C. § 554).  The provision was added by Representative Schiff as a part of a larger amendment to the House's Reauthorization Act bill.  *See* H.Amdt. 499 (2005) (described as Amendment No. 11 during the House's floor debate on the Reauthorization Act).  Referred to as the Coble-Schiff-Forbes amendment, Cong. Rec. *H*.6281 (daily ed. Jul. 21, 2005) (statements of

6

Reps. Stearns and Forbes), the amendment inserted as Title III of the Reauthorization

Act the full text of another bill that had been introduced by Representative Schiff, titled

"Reducing Crime and Terrorism at America's Seaports Act of 2005," H.R. 2651, 109th

Cong. (2005).[4]

Those who spoke in favor of the Coble-Schiff-Forbes amendment described it as

a necessary tool to fight terrorism. *See generally* Cong. Rec. *H*.6280-82 (daily ed. Jul.

21, 2005).  Representative Schiff, for example, stated that the amendment "is aimed at

filling a gaping hole in our defense against terrorism and making America's ports,

passengers and cargos safer."  Cong. Rec. *H*.6280 (daily ed. Jul. 21, 2005) (statement

of Rep.Schiff).  As he explained: "I want to be clear, our amendment is intended to go

after terrorists, terrorist acts and other **dangerous felons**.  There is no intention to

reach accidents or other unintentional acts that might occur at seaports."  *Id*. (emphasis

added).

During the amendment's short debate, the new criminal provision was never

specifically discussed.  When Representative Coble detailed the ways in which the

amendment "will protect our seaports," the proposed criminal statute was not

mentioned.  *See id*. at H6281 (statement of Rep. Coble).  The closest reference made

to the proposed statute during debate was the general statement that "stopping cargo

theft and smuggling is a national security issue," *id*. at *H*.6281 (statements of Rep.

[4] The separate bill introduced by Congressman Schiff, H.R. 2651, did not originally
contain the illegal export/smuggling provision. The provision accompanied the
Congressman's amendment to the Reauthorization Act as Title III of the Act. *See* Cong.
Rec. *H*.6280 (daily ed. Jul. 21, 2005) (listing "Sec. X12. Smuggling Goods from the
United States").  The legislative history does not explain how or why the smuggling
provision was added to the bill.

Stearns), and that the amendment is intended "to deter and prevent terrorist attacks on our ports, our sea vessels, and crack down on the theft and smuggling of cargo," *id*. at 6280 (statement of Rep. Schiff). The specific criminal provision at issue in this case, § 554, seems to have been an afterthought in the legislation. *See also supra* footnote 4.

Although the Senate passed a version of the Reauthorization Act that did not contain the new illegal export/smuggling provision, the law was resuscitated as Section 311(a) during the joint House and Senate conference committee. In discussing Section 311(a), the Conference Report for the Reauthorization Act merely states, in part: "This section creates a new criminal offense for illegally smuggling goods from the United States and establishes a maximum penalty of 10 years imprisonment." H.R. Rep. No. 109-333 (2005), *reprinted in* Cong. Rec. H11279-11310 at 11307 (daily ed. Dec. 8, 2005), *reprinted in* 2006 U.S.C.C.A.N. 184. The final Reauthorization Act also amended the federal money laundering statute, 18 U.S.C. § 1956(c)(7)(D) by including the newly-enacted illegal export/smuggling provision (18 U.S.C.§ 554) in the definition of "specified unlawful activity." *See* Pub. L. 109-177, § 311(c) (2006).

Thus, the clear objective of the legislation was not to reach misdemeanant violators of the CITES treaty; that work had been completed in 1973. The express intent of Congress (and most likely the Department of Justice) was to curb the surreptitious export of instruments of terrorism. *See, e.g., United States v. Sprenger*, 625 F.3d 1305 (10th Cir. 2010) (illegal export of firearms to Mexico, having "a cache of weapons in the gas tank of a truck driven by [Defendant]"); *United States v. Frazier*, 605 F.3d 1271 (11th Cir. 2010) (elaborate scheme to smuggle guns to Canada in exchange for drugs or

money); *United States v. Chan Hok Shek*, 2010 WL 4694448 (D. Mass. Nov. 10, 2010)

(Defendant and Malaysian associates conspired to arrange purchase and export of

aircraft indicators listed on the United States Munitions List without the required license

and documentation);*United States v. Vega*, 2009 WL 1651475 (S.D. Tx. June 12, 2009)

(Multiple guns and ammunition secreted in vehicle compartment);*United States v.*

*Diabate*, 317 F. App'x 638 (9th Cir. 2008) (attempted export of defense articles without a

license, in violation of 22 U.S.C. § 2778(b)(2) and (c), and one count of smuggling

goods from the United States, in violation of 18 U.S.C. § 554); *United States v.*

*Hernandez*, 389 F. App'x 932 (11th Cir. 2010) (Defendant worked closely with others to

purchase firearms for export, to deliver firearms to a common carrier without notice to

carrier).[5]  Obviously, the Department of Justice did not misunderstand the clear

legislative intent of the statute. Still, in the face of this history, the government now

attempts to bootstrap a misdemeanor prosecution of the Endangered Species Act into

a felony prosecution of an anti-terrorism export statute.[6]  It is precisely this arbitrary

exercise of power by the executive branch of government which violates the principles

of distributive justice and which the framers of the Constitution intended to prohibit

through the due process clause. *Hurtado v. California*, supra.

_____

[5]  The cases listed constitute the complete result of a Westlaw search of all federal
cases involving 18 U.S.C. § 554 prosecutions.

[6]  The conspiracy statute is proof positive that Congress has already considered and
rejected the notion that an uncompleted misdemeanor may not be back-doored into a
felony by virtue of being paired with a felony. *See* 18 U.S.C. § 371, para. 2.

2.    *The indictment is premised on an absurd prosecutorial paradigm (a felony defined by a criminal objective to commit a misdemeanor) because the government knows that it cannot prove a substantive violation of the Endangered Species Act.*

The Endangered Species Act's operative statute, 16 U.S.C. §§ 1538(a) and (c), and its corresponding regulations, require 1) *trade* of a protected species not subject to the treaty's exceptions, and 2) that the defendants "deliver, receive, carry, transport or ship" the protected species in interstate or foreign commerce.[7]  In contrast, the anti-terrorism export statute on which the indictment is built, reaches any article or merchandise "prior to export." As noted above, the horns in question appear to the parties to be very old, and may well pre-date the treaty.  Second, the horns came from a Division of Fish and Wildlife collection, and had long since been removed from "trade,"

---

[7]    **§1538. Prohibited acts**
**(a) Generally**
(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to--
(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;
(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

The indictment also singles out section (c)(1), which states:

**(c) Violation of Convention**
(1) It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof.

and third, the defendants did not move or attempt to move the horns in interstate or foreign commerce.

The CITES treaty is composed of 25 articles and 4 appendices.  Its structure is relatively straight-forward.  For example, <u>Article II</u> discusses the treaty's principles and details how protected wildlife is divided into three appendices according to the level of protection required.  <u>Articles III, IV and V</u>, in turn, describe the trade regulation requirements for species found in Appendix I, II and III, respectively. Certain Rhinoceros are listed in Appendix I.  <u>Article VI</u> discusses the requirements for permits and certificates, a model of which can be found in Appendix IV.  And <u>Article VII</u> details "exemptions" where the requirements of Articles III through VI do not apply.  Of the treaty's remaining articles, most deal with administrative issues relating to implementation and maintenance of the treaty. The parties to the treaty must agree that they "shall not allow trade in specimens of species included in Appendices I, II and III *except in accordance with the provisions of the present Convention*."  CITES, art. II, ¶4 (emphasis added).

As CITES article II, paragraph 4 implies, the provisions of the Convention do not prohibit all trade in protected species, even if they are found in CITES Appendix I. In fact, the Convention allows for countries to issue import and export permits for Appendix I species, *see* CITES art. III, and it also allows for certain "exemptions" from the treaty, *see* CITES art. VII.  Here, for example, even if the rhinoceros horns in this case were acquired from an Appendix I species, the CITES treaty does contain allowances for their legal export from the United States into Ireland.  And, again, the mere purchase or possession of the horns in Colorado did not violate any federal law or regulation. One of

the most prevalent exemptions allowed for under CITES is the "pre-convention animal"

exception. *See, e.g., United States v. Grigsby*, 111 F.3d 806, 825-828 (11th Cir. 1997)

(discussing the "pre-Convention exception," along with the "sports-hunted trophies

exception" and the "personal baggage/household effects exception"); *Humane Society*

*of the United States v. Babbitt*, 46 F.3d 93, 96 (D.C. Cir. 1995) (discussing the

designation of an Asian elephant as a "pre-Convention animal" under CITES); *see also*

*United States v. Crutchfield*, 26 F.3d 1098, 1099 (11th Cir. 1994) (stating that "pre-act"

iguanas that were in the United States prior to the Convention do not require a permit,

nor do "captive-bred" offspring of such animals); *United States v. James*, 344 F. App'x

382 (9th Cir. 2009) (reversing conviction because the trial court erroneously excluded

expert testimony on the existence of pre-CITES iguanas). Specifically, the CITES treaty

states: "Where a Management Authority of the State of export or re-export is satisfied

that a specimen was acquired before the provisions of the present Convention applied

to that specimen, the provisions of Articles III [regulating Appendix I species], IV

[regulating Appendix II species] and V [regulating Appendix III species] shall not apply

to that specimen where the Management Authority issues a certificate to that effect."

CITES, art. VII, para. 2. Currently, the government cannot render an opinion as to

whether the horns were acquired before the enactment of the treaty, since it refuses to

pursue testing of their age. In sum, even if it made a modicum of sense to prosecute

the defendants as felons based on an aim to commit a misdemeanor, that misdemeanor

may not even reach the horns in this case. *See, e.g.*, *Grigsby*, 111 F.3d at 825-27, 833-

34.

3.    As applied, 18 U.S.C. § 554 effectively converts conduct codified as a misdemeanor into a felony, resulting in an egregious and unconstitutional penalty.

The limitless phrase "contrary to any law or regulation of the United States" is what defines the anti-terrorism export statute. Without it, the statute would define no crime at all.  Nonetheless, Congress chose to classify the offense as a serious felony, and it cannot, therefore, be defined by conduct already codified as a mere misdemeanor.  Yet that is precisely what the government aims to do. In short, by prosecuting the defendants for making a violation of the Endangered Species Act their uncompleted criminal objective, the government reaps a possible penalty that is ten times greater than maximum penalty had the defendants committed a completed, substantive violation of the Act.  Due process demands dismissal under these facts.

**VI.    The anti-terrorism export state as applied, is unconstitutional vague.**

The Court need not address the following argument if it finds 18 U.S.C. § 554 unconstitutional as applied.  The Court should nevertheless be aware that, apart from the limitless reference to "any law or regulation of the United States," the statute also seems to be premised on a strangely worded and unclear *mens rea*.

A criminal statute must clearly define the conduct it proscribes or else it will be declared void for vagueness, in violation of due process.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The void-for-vagueness doctrine embraces two main values, of which the doctrine hopes to protect.

First, the statute must define the criminal offense with sufficient definiteness that a person of ordinary intelligence can understand what conduct is prohibited, so as to "steer between lawful and unlawful conduct."  *Id*.  Second, the statute must "provide

13

explicit standards for those who apply them," so as to prevent arbitrary and discriminatory enforcement. *Id*. *See also Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Williams*, 553 U.S. 285, 304 (2008); *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and **subjective basis**." *Grayned*, 408 U.S. at 109; *see also Jellum v. Cupp*, 475 F.2d 829, 832 (9th Cir. 1973) (holing a statute void for vagueness because it "supll[ied] no standards by which the prosecutor, judge, or jury could decide whether [the defendant]'s conduct was prohibited or not."). These two values have been summarized as being "concern[ed] about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling v. United States*, 130 S.Ct. 2896, 2933 (2010).[8] In this case, § 554 does not pass the test.

At least two thirds, and possibly all of the statute rests on a mens rea which requires that, "prior to exportation" of "any merchandise, article or object," the defendant "know[] the [relevant object] to be intended for exportation contrary to any law or regulation of the United States." What does this mean? What must an individual "know" about the plans that are intended for an object? If the government's theory is that the defendants intended to export in violation of the Endangered Species Act, must it prove a specific intent? If it is a third-party who intends to do the exporting, as the facts of this

---

[8] When an uncertain statute inhibits an individual's first amendment rights, there is a third value that the void for vagueness doctrine protects. *Grayned*, 408 U.S. at 109. In those situations, the fear is that the vague statute will chill lawful speech, and that an individual will opt to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Id.* (ellipses omitted).

case suggest and as the statute allows, how can an individual "know" the intent of a third-party? Must the defendant's knowledge and the intent of the third party exist at the same time, or can the intent to illegally export be formed later? If so, how much later? What if the defendants are incorrect about the third-party's future intent?  *Cf. United States v. Apollo Energies, Inc.*, 611 F.3d 679, 689-90 (10th Cir. 2010) ("Central  to all of the Supreme Court's cases on the due process constraints on criminal statutes is foreseeability-whether it is framed as a constitutional constraint on causation [citation omitted] and mental state [citation omitted], or whether it is framed as a presumption in statutory construction [citation omitted]").

On this subject, it is important to point out that in previous cases, it was said that a statute's *mens rea* requirement could alleviate any notice concerns.  *See, e.g.*, *Screws v. United States*, 325 U.S. 91, 101-04 (1945) (plurality opinion).  That view is of no consolation here, where the *mens rea* provision itself is the vague culprit.  Put another way, the problem is that the statute's *mens rea* itself provides "no ascertainable standard of guilt."  *United States v. L. Cohen Grocery Co.*, 225 U.S. 81, 89 (1921). *See also Goguen*, 415 U.S. at 578 (holding that a statue was void for vagueness because "[s]uch a provision simply has no core. This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause.").[9]

---

[9]  Compare § 554 to its significantly older cousin, 18 U.S.C. § 545, which criminalizes illegal *imports.* In some respects, the two statutes share similar language. Nonetheless, § 554 lacks certain fundamental elements contained in the import statute. First, § 554 requires a clear nexus to interstate or foreign commerce; there must have been an import. Second § 545 assigns a clear mental state to a single individual, e.g., "knowingly, willfully, and with intent to defraud the United States." The illegal import statute was passed in 1948.

Finally, outside of the First Amendment context, "vagueness challenges . . . must be examined in light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975); *see also United States v. Platte*, 401 F.3d 1176, 1189-90 (10th Cir. 2005); *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997).  As applied to the facts of this case, Messrs. O'Brien and Hegarty's conduct falls outside the intended scope of the act.  This is not a case where "even if the outermost boundaries of [the statute are] imprecise, any such uncertainly has little relevance where [defendant's] conduct falls squarely with the 'hard core' of the statute's proscriptions." *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973).

## V.    Conclusion

For all of the foregoing reasons, Messrs. O'Brien and Hegarty respectfully request that the indictment be dismissed.


Respectfully submitted,

RAYMOND P. MOORE                    RECHT & KORNFELD, P.C.
Federal Public Defender


s/ Virginia L. Grady_____     s/ Richard K. Kornfeld_____
VIRGINIA L. GRADY                        RICHARD K. KORNFELD
Assistant Federal Public Defender        1600 Stout Street, #1000
DAVID E. JOHNSON                         Denver, Colorado 80202
Research and Writing Specialist          Telephone:   (303) 573-1900
633 Seventeenth Street, Suite 1000       Fax:         (303) 446-9400
Denver, Colorado  80202                  Rick@rechtkornfeld.com
Telephone:   (303) 294-7002              Attorney for Defendant Hegarty
FAX:         (303) 294-1192
Virginia.Grady@fd.org
Attorney for Defendant O'Brien

16

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2011, I electronically filed the foregoing

**DEFENDANTS' JOINT  MOTION TO DISMISS THE INDICTMENT**

with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Linda McMahan
Assistant U.S. Attorney
Email: linda.mcmahan@usdoj.gov

Robert Schuyler Anderson
U.S. Department of Justice
Email:  robert.anderson8@usdoj.gov

Jennifer A. Whitfield
U.S. Department of Justice
Email:  jennifer.whitfield@usdoj.gov

s/ Virginia L. Grady
VIRGINIA L. GRADY
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado  80202
Telephone:   (303) 294-7002
FAX:         (303) 294-1192
Virginia.Grady@fd.org
Attorney for Defendant

.